SUSAN M. CHEHARDY, Chief Judge.
1 ^Defendant, Ricky Bruce, Jr., appeals from his conviction of aggravated rape. For the reasons that follow, we affirm defendant’s convictions and sentences.
PROCEDURAL HISTORY
On August 22, 2011, a St. Charles Parish Grand Jury indicted defendant with aggravated rape in violation of La. R.S. 14:42 (count one) and aggravated burglary in violation of La. R.S. 14:60 (count two). Defendant was arraigned and pled not guilty to both charges.
Defendant’s motion to suppress statement was denied on October 29, 2013, to which the defense objected. Following a two-day jury trial, on January 16, 2014, a twelve-person jury returned a verdict of guilty as charged on both counts. Defendant’s motions for post-verdict judgment of acquittal and new trial were denied on April 29, 2014. On June 25, 2014, defendant was sentenced on count one to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On count two, defendant was sentenced to twenty years imprisonment at hard labor, to be served concurrently with the sentence on count hone. Defendant’s motion to reconsider sentence was denied on July 28, 2014 and this timely appeal followed.
FACTS
At approximately 11:00 a.m. on July 10, 2011, after ending an eight-month relationship with defendant a few days earlier, C.G.,[1] the victim in this case, heard loud pounding and screaming at her front door in the Lakewood Apartments in Luling, Louisiana. She recognized the voice as defendant’s. As she opened the door to ask him to leave, defendant kicked the *673 door in, forced his way in, and pushed her to the floor upon which she struck her face. Defendant, who was “completely enraged,” hurled obscenities at the victim and told her, “You always heard I was a monster. I’m going to show you what kind of monster I am today.” As she tried to get up, defendant pushed her back down and proceeded to the kitchen where he located her purse and dumped it out, looking for drugs and money. He told the victim, “I’m having ... fun f* *king you up because I’m going to f* *k you up for the rest of the day and I’m going to have so much fun torturing you. And if I leave and you call the police, I’ll come back and Mil you.”
In an effort to calm defendant down, the victim asked him to sit on the sofa so they could talk. Defendant replied: “I don’t want to talk. We’re going to f* *k.” He then pushed the victim’s head towards his groin and unzipped his pants, forcing a portion of his penis into the victim’s mouth. The victim implored him to stop, complaining that he was hurting her. Defendant forced her into the kitchen, placed his hands around her neck, and told her, “I could kill you right now, but that would be too easy.” In her sustained effort to calm defendant down, the victim asked him to join her outside for a cigarette. He agreed. At trial, the victim explained she |4thought she would be able to get somebody’s attention while outside. However, she was unable to do so. Nor was she able to flee since the yard was fenced in and the gate padlocked. So the victim continued to try to calm defendant who was pacing back and forth. They eventually returned back inside and sat on the sofa. There, the victim attempted to direct the conversation to the topic of defendant’s children. Defendant replied: “We’re going to f* *k.”
In response, the victim proposed that defendant proceed upstairs and rest in her bedroom. Defendant agreed, but once there, he pulled off the victim’s underwear and shorts and began performing oral sex on the victim, to which she told him repeatedly, “Please stop. You’re hurting me.” He then penetrated the victim’s vagina with his penis. In an attempt to extricate herself from the situation, the victim retreated into her bathroom, but defendant soon followed. He propped her up on the countertop and again penetrated her vagina with his penis. She repeated: “You’re hurting me, you’re hurting me. Please stop, please stop.” Defendant eventually stopped and soon fell asleep in the victim’s bed. The victim grabbed her keys and fled the house in her car. It was approximately 12:30 or 1:00 p.m. She made her way to the house of a Mend, Laurie Fisher, who resided two streets away on St. Nicholas Street.
Ms. Fisher testified that after receiving a telephone call from C.G. on July 10, 2011 during which C.G. was crying and very upset, C.G. arrived at her house. According to Ms. Fisher, C.G. was shaking, “very hysterical,” had swollen, red eyes, and was having difficulty speaking. While there, C.G. called the police. At approximately 3:29 p.m,, the St. Charles Parish Sheriffs Office received the 9-1-1 call from the victim, in which she stated that defendant had forced his way into her apartment, pushed her, hit her, and told her that he would kill her if she called the police. This 9-1-1 call did not include an allegation of rape.
| ^Deputy Terry Dabney of the St. Charles Parish Sheriffs Office responded to C.G.’s apartment. Along with other officers, Deputy Dabney entered the apartment to find defendant sleeping in the upstairs bedroom, where he was placed under arrest.
*674 Meanwhile, Detective Jeremy Pitchford, the lead detective in this case, met with the victim at Ms. Fisher’s residence, where he encouraged her to go to the hospital. Eleven photographs taken during her hospital visit were introduced into evidence. The victim described each photograph as it was shown to the jury. She explained that her face was a “little swollen on the side where I hit the • ground.” Other photographs depict various bruises on her legs, arms, and breasts. C.G. testified that most of these bruises were caused by the incident that day, but some may have been from previous incidents. For instance, she explained that some of the bruises on her breasts may have been from a previous incident when defendant bit her breasts “when things were good between [them].”
Detective Pitchford testified regarding the medical report prepared in connection with C.G.’s hospital visit. According to the detective, the report does not indicate any injuries to the victim’s head and notes that C.G. denied suffering any trauma to her head. The detective also did not observe any injuries to her head or face. The medical report further notes no perianal vaginal tears, bruises, abrasions, or lacerations. Similarly, Ms. Fisher testified that she did not observe any marks- on C.G.’s throat despite being told that defendant had placed his hands around the victim’s neck.
Detective Pitchford first made contact with defendant while in custody at the correctional center, where he obtained a statement from him. At 7:50 p.m. on July 10, 2011, with an advice of rights form, defendant was advised of his Miranda rights, indicated he understood them, waived them, and gave a statement. The 1 ^statement commenced at 7:52 p.m. and concluded at 8:14 p.m. In the statement, defendant explained that he had been taking bath salts all weekend. He stated that he had last used them around 3:00 or 4:00 a.m. on July 10, 2011. At the time of his statement, approximately sixteen hours later, Detective Pitchford observed that defendant “seemed normal.” Defendant admitted to forcing his way into the victim’s apartment, shoving her to the ground, arguing with her, and insulting her with obscenities. He avowed that he engaged in nothing but consensual sexual intercourse with her.
Kristen Dieeedue, an acquaintance of defendant, testified that defendant arrived at her home around 6:00 a.m. on July 10, 2011 and that he appeared sober. They talked, Ms. Dieeedue served him a meal, and then dropped him off at his mother’s house around 8:30 a.m.
Craig Dempster, a friend of defendant since high school, testified that he called C.G. around 11:00 a.m. on July 10, 2011. C.G. informed Mr. Dempster that defendant was at her house at the time, hung up, and continued conversing via text messages. Mr. Dempster testified that he did not perceive anything from his commúnication with C.G. that morning which indicated she was fearful of defendant.
Defendant took the stand and testified that on the morning of July 10, 2011 he was walking from his mother’s house to a girlfriend’s house when he passed the victim’s home. As their relationship had recently soured when C.G. told defendant that she had been seeing another man, defendant took this opportunity to confront C.G. and perhaps catch her with this man. Defendant explained that as C.G. opened her front door, he pushed it open, knocking her to the ground. He denied striking her and stated that as he helped her up, she was “screaming at the top of her lungs.” Defendant responded by calling her names and blaming her for the ^termination of their relationship. He denied placing his hands on her and explained that they both eventually calmed *675 down, began talking, and were reconciling when they engaged in consensual sexual intercourse.
DISCUSSION
On appeal, defendant raises two assignments of error: (1) the trial court erred in denying the motion for post-verdict judgment of acquittal because the evidence was insufficient to support the guilty verdict of aggravated rape; and (2) the trial court erred in denying defendant’s motion to suppress statement.
The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal pursuant to La.C.Cr.P. art. 821. State v. Bazley, 09-358 (La.App. 5 Cir. 1/11/11), 60 So.3d 7, 17, writ denied, 11-282 (La.6/17/11), 63 So.3d 1039. Here, defendant filed a motion for post-verdict judgment of acquittal in which he argued the evidence was insufficient to support the guilty verdict of aggravated rape. As a result, this assignment of error is properly before us on appeal.
In reviewing the sufficiency of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-674 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); State v. Mickel, 09-953 (La.App. 5 Cir. 5/11/10), 41 So.3d 532, 534, writ denied, 10-1357 (La. 1/7/11), 52 So.3d 885.
This directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact’s rational Iscredibility calls, evidence weighing, and inference drawing. State v. Caffrey, OS-717 (La.App. 5 Cir. 5/12/09), 15 So.3d 198, 202, writ denied, 09-1305 (La.2/5/10), 27 So.3d 297. This deference to the fact finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. Id. As a result, under the Jackson standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at trial established guilt beyond a reasonable doubt, but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. State v. Jones, 08-20 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240.
In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. Caffrey, supra. Indeed, the resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. See State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Dixon, 07-915 (La.App. 5 Cir. 3/11/08), 982 So.2d 146, 153, writ denied, 08-0987 (La.1/30/09), 999 So.2d 745. Specifically in sex offense cases, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. Id. at 153-54.
In the instant case, defendant argues that the evidence was insufficient to sup *676 port the guilty verdict of aggravated rape pursuant to La. R.S. 14:42(A)(2), |8which defines the offense as “a rape committed ... where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed ... [w]hen the victim is prevented from resisting the act by threats of. great and immediate bodily harm, accompanied by apparent power of execution.” Defendant argues that the evidence was insufficient to support his conviction under this theory since the State did not present evidence establishing that the victim’s efforts to resist were overcome by threats of force. Rather, defendant submits that the evidence only supported the lesser offense of forcible rape, which is defined in pertinent part as follows:
Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed ... [w]hen the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
La. R.S. 14:42.1(A)(1).
The Louisiana Supreme Court has held that the legal definition of aggravated rape under La. R.S. 14:42(A)(2) is “virtually identical” to that of forcible rape. State v. Parish, 405 So.2d 1080, 1086 (La.1981). Both require that the victim be prevented from resisting by threat of great harm under circumstances where the victim reasonably believes that resistance would be futile. Id. at 1086-87. The only distinction is the degree of force employed and the extent to which the victim resists. Id. at 1087. Thus, the jury is authorized to subject a guilty defendant to more severe punishment by convicting him of aggravated rape rather than forcible rape. Id. At the same time, there is no magic formula to determine which acts of coerced sexual intercourse warrant the greater punishment of aggravated rape rather than forcible rape. State v. Puckett, 02-997 (La.App. 5 Cir. 1/28/03), 839 So.2d 226, 231. Each case must be examined on its own facts. Id. |10The mere fact the defendant was unarmed and the victim suffered no extensive physical pain or injury does not negate the possibility that an aggravated rape occurred. Id.
The Supreme Court has concluded:
It was the legislative aim to divide the continuum of acts of coerced sexual intercourse into two categories, aggravated rape and forcible rape, thereby assigning to the jury the function of fixing the range of permissible punishment for convicted offenders by returning a verdict which appropriately fits the crime and the degree of force employed.
Parish, 405 So.2d at 1087.
Consequently, on appeal, we are asked to consider whether any reasonable trier of fact, viewing all of the evidence in the light most favorable to the prosecution, could find beyond a reasonable doubt that defendant committed the acts required by both the aggravated and forcible rape statutes and that the degree of force employed warranted punishment in the greater, rather than lesser, degree. See Parish, supra.
In the instant case, C.G. testified that defendant penetrated her vagina with his penis over her protestations after he had forced his way into her house in a rage, pushed her to the floor, screamed obscenities at her, promised to torture her, choked her, and threatened to kill her if she attempted to seek help. Defendant offered a different version of events in which the sexual intercourse was consensual.
*677 In returning a guilty verdict of aggravated rape, the jury, which had been instructed on the responsive verdict of forcible rape, evidently gave more credence to the victim’s version of events. We will not re-evaluate the credibility of witnesses or re-weigh the evidence on appeal. We find the evidence in the record before us, when viewed in the light most favorable to the prosecution, was sufficient to convince any rational trier of fact beyond a reasonable doubt that ^defendant engaged in sexual intercourse without the lawful consent of the victim because the victim was prevented from resisting by threats of great and immediate bodily harm, accompanied by the apparent power of execution. Furthermore, we find that any rational trier of fact, when viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the degree of force employed by defendant warranted the greater punishment mandated by a conviction of aggravated rape.
This assignment of error is without merit.
In defendant’s second assignment of error, he argues that the trial court erred in denying his motion to suppress his recorded statement.
'Prior to trial, on October 15, 2013, defendant filed a motion to suppress his statement. This motion was heard on October 29, 2013. At this hearing, Detective Pitchford testified that he first encountered defendant on the evening of July 10, 2011 while defendant was in custody at the Nelson Coleman Correctional Center. When the detective arrived, he “handed [defendant] a notebook and ink pen and asked him to write what occurred that day.” Defendant wrote down an outline of the day’s events in which he stated that he “pushed [his] way through” the victim’s front door and called her “all kinds of degrading names.” He stated that he and the victim engaged in consensual sexual intercourse. Thereafter, Detective Pitch-ford advised defendant of his Miranda[2] rights with the aid of an advice of rights form, which defendant indicated he understood and waived, and then provided his recorded statement. At the conclusion of the suppression hearing, the court admitted defendant’s recorded statement and suppressed his handwritten statement. Defendant now seeks review of the trial court’s ruling admitting.his recorded statement.
112Trial courts are vested with great discretion when ruling on a motion to suppress. State v. Smith, 11-638 (La.App. 5 Cir. 3/13/12), 90 So.3d 1114, 1120. Thus, the ruling of a trial court on a motion to suppress will not be disturbed absent an abuse of that discretion. Id. Also, a trial court’s conclusions on the credibility and weight of the testimony relating to the voluntary nature of the defendant’s confession are accorded great weight and will not be disturbed unless they are not supported by the evidence. Id. In reviewing a trial court’s ruling on a pretrial motion to suppress, an appellate court may review the testimony adduced at trial, in addition to the testimony adduced at the suppression hearing. Id.
 Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his Miranda rights, that he voluntarily and intelligently waived his Miranda rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement, or promises. Smith, *678 90 So.3d at 1120. A determination as to voluntariness of a statement is made on a case-by-case basis and is based upon a totality of the circumstances. Id. at 1120-21.
On appeal, defendant argues that the trial court erred in admitting his recorded statement because “the illegality of the written statement served to undermine the voluntariness of the subsequently obtained recorded statement.” In support of this argument, defendant relies on the United States Supreme Court case, Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), in which the Supreme Court was confronted with a similar factual scenario where the suspect provided a confession in the absence of Miranda warnings, was advised of her Miranda rights, and then repeated her confession. Finding that this midstream recitation of warnings after interrogation and an unwarned confession could not Ineffectively comply with Miranda’s constitutional requirement, a plurality of the Court held that a statement repeated after a warning in such circumstances is inadmissible. See Seibert, 542 U.S. at 604, 124 S.Ct. at 2605. Defendant argues that the comparable factual scenario in his case likewise necessitates the suppression of his recorded statement.
The present case is distinguishable from Seibert. In Seibert, the interrogating officer admitted at the suppression hearing that it was a “conscious decision” to offer a midstream recitation of warnings. Whereas, in the instant case, there was no such admission from Detective Pitchford nor any indication that he deliberately employed this two-step interrogation technique. This is a dispositive distinction.
Seibert is a plurality decision. The U.S. Supreme Court has held regarding such decisions: “When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, ‘the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds....’” Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (citation omitted). Accordingly, federal circuit courts have recognized that the holding of Seibert is found in Justice Kennedy’s opinion concurring in judgment. See United States v. Courtney, 463 F.3d 333, 338 (5th Cir.2006); United States v. Williams, 435 F.3d 1148, 1157-58 (9th Cir.2006); United States v. Naranjo, 426 F.3d 221, 231-32 (3d Cir.2005). In Justice Kennedy’s concurrence, he noted that he “would apply a narrower test applicable only in the infrequent case ... in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning.” Seibert, 542 U.S. at 622, 124 S.Ct. at 2616 (Kennedy, J., concurring). He added: “If the deliberate two-step strategy has been used, postwarning statements that are 114related to the substance of prewarning statements must be excluded unless curative measures are taken before the post-warning statement is made.” Id.
Based on this, the jurisprudence holds that “Seibert requires the suppression of a post-warning statement only where a deliberate two-step strategy is used and no curative measures are taken....” Courtney, 463 F.3d at 338; see also Williams, 435 F.3d at 1158 (“where law enforcement officers deliberately employ a two-step interrogation to obtain a confession and where separations of time and circumstance and additional curative warnings are absent or fail to apprise a reasonable person in the suspect’s shoes of his rights, the trial court should suppress the confession.”) (Emphasis original).
*679 Recognizing that the holding of Seibert is found in Justice Kennedy’s opinion concurring in judgment, we find that, in the absence of evidence that Detective Pitchford deliberately employed the two-step interrogation technique, the trial court did not err in admitting defendant’s recorded statement. Nevertheless, we find that even if the trial court had erred in admitting this statement, any such error was harmless because defendant’s trial testimony duplicated the content of his two pre-trial statements. See State v. Tate, 98-117 (La.App. 5 Cir. 5/27/98), 714 So.2d 252, 256 (finding that because the defendant’s trial testimony duplicated the defendant’s inculpatory statement, its admission, if erroneous, was harmless); see also State v. Hankton, 12-466 (La.App. 4 Cir. 4/80/14), 140 So.3d 398, 411. We also find that any prejudice due to the admission of defendant’s recorded statement was mitigated by the fact that defendant did not offer an inculpatory statement with regard to the allegation of rape in either of his statements or trial testimony. Rather, he consistently maintained that he and the victim engaged in consensual sexual intercourse.
|1KAlthough we find that the trial court did not err in admitting defendant’s recorded statement pursuant to the standard in Seibert, we choose to note our agreement with Justice O’Connor’s critique in her dissent that it is the rare case where an interrogating officer will admit to deliberately employing the unconstitutional two-step interrogation technique. See Seibert, 542 U.S. at 626, 124 S.Ct. at 2618 (O’Connor, J., dissenting) (“This case presents the uncommonly straightforward circumstance of an officer openly admitting that the violation was intentional.”). The present case is of the common variety where there is no evidence to suggest that Detective Pitchford deliberately employed the two-step interrogation technique to circumvent defendant s constitutional rights. Nevertheless, we choose to express our disapproval of the two-step interrogation conducted in this case.
This assignment of error is without merit.
ERRORS PATENT
The record was reviewed for errors patent in accordance with La.C.Cr.P. art. 920, State v. Oliveaux, 312 So.2d 337 (La.1975), and State v. Welland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals no errors patent in this case.
DECREE
For the foregoing reasons, defendant’s convictions and sentences are affirmed.
AFFIRMED.

. The victim's initials, as well as the initials of the victim’s family members, are used under the authority of La. R.S. 46:1844(W)(3), which permits the Court to identify a crime victim who is a minor, or a victim of a sex offense, by using his or her initials.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).