GRAVOIS, J. 11 Defendant, Marcus Harris, appeals his conviction of one count of forcible rape of a juvenile, in violation of La. - R.S. 14:42.1. For the following reasons, we affirm defendant’s conviction and sentence. PROCEDURAL HISTORY ‘On December 12, 2014, defendant, Marcus Harris, was charged in a bill of information filed by the Jefferson. Parish District Attorney with one count of forcible rape of a juvenile (DOB 4/17/95), in violation of La. R.S. 14:42.1.[1] Defendant pled not guilty at his arraignment on December 15,2014; • Trial commenced on September 6, 2016 before a twelve-person jury that found defendant guilty as charged. On September 19, 2016, defendant filed a motion for a new trial and post-verdict judgment of acquittal, which was denied on September 26,. 2016, On October 6, 2016, the trial court sentenced defendant to thirty years imprisonment at hard labor.[2],Also on October 6, 2016, the State filed a habitual offender bill of information, alleging defendant to be a fourth felony offender. Subsequently, on October 17, 2016, the State amended the habitual offender bill of information, alleging defendant to be a second felony offender, to which defendant stipulated. On that same day, the trial court vacated the original sentence and resentenced defendant under the habitual offender statute (La. R.S. 15:529.1) to thirty years imprisonment at hard labor without the benefit of -probation, parole, or suspension of sentence. On October 18, 2016, defendant filed a motion -for an appeal, which was granted by the trial court on October 20,. 2016. This appeal followed. | pFACTS Cynthia Deviney was the school counsel- or at Bissonet Plaza Elementary School in September 2009. During her time as school counselor, she begari to counsel A.R, and her half-sister, R.G.[3] Ms. Deviney explained that she counseled both girls regarding their behavior—their lack of focus—-and assisted - them with homework.[4] She counseled them at school and also at their home nearby on Kawanee Avenue. She described that after a successful first and second home visit with the girls, their father (defendant), and Penny Myers[5] (defendant’s live-in girlfriend at the time), she returned a third time but was denied entrance into the home. She recounted that “the girls were very upset that [she] was there” and that they told her that their “daddy ha[d] absolutely forbidden” her to come into the house. After that, she just met and worked with the girls after school. Ms. Deviney testified that subsequently, on March 1, 2010, R.G. came to see her, and “she was very, very, very upset,” Ms. Deviney described that she had “never seen her like that before.” After Ms. Devi-ney asked R.G. what was the matter, R.G. told Ms. Deviney that “her father had molested her.” R.G. provided Ms. Deviney with details about what had happened to her the night before. R.G. also told -Ms. Deviney that it had happened three times before the incident the previous night. Ms. Deviney also spoke with A.R., who was reluctant at first, but told Ms, Deviney that her “father did it to [her]” and that “he stuck it to [her].” After these disclosures, Ms. Deviney called the police and -the Department of Child and Family Services (“DCFS”),[6] who arrived at the school and interviewed the girls. [ ¡¡Deputy Eric Meaux with the Jefferson Parish Sheriffs Office responded to the call regarding a report of two juveniles “reporting rape” at Bissonet Plaza Elementary School on March 1, 2010. After his arrival at the school, Deputy Meaux spoke with Ms. Deviney, who informed him that the girls “were making a report that they had been raped by their father.” He spoke separately with both A.R. and R.G.: R.G. provided details consistent with what Ms. Deviney told him, and while A.R. disclosed inappropriate acts, she did not provide details and “was very distant and withdrawn during questioning.” After he spoke with the girls, Deputy Meaux turned the case over, to the detectiyes in the Personal Violence Unit. Detectives Kay Horne and Randall Fernandez with the Jefferson Parish Sheriffs Office Personal Violence Unit participated in the investigation regarding defendant, A.R., and R.G. When Detective Horne arrived at the school, she met with each of the girls. She testified that A.R. told her that “the night before that her . father had entered her room and stuck his stuff inside of her.” She testified that R.G. disclosed sexual abuse by her father and that the information she provided was consistent with what she told Ms. Deviney and Deputy Meaux. At some point later that day, defendant and Ms. Myers arrived at the school, and Ms. Deviney alerted them to the allegations. Ms. Deviney described that defendant was-“very upset” and said he “would never do anything to [his] girls.” She testified that he and Ms. Myers eventually left the .school. Deputy Meaux testified that while he. was speaking with A.R., Ms. De-viney came in to tell him that defendant and Ms. Myers arrived at the school, she apprised them of the situation, and sent them home. He described: .that if he had .encountered defendant at the school, he would have placed him under arrest. After speaking with the girls, another officer in Detective Horne’s unit applied for a search warrant of the girls’ home at 6404 Kawan-ee Avenue. She executed the warrant later that day and Rencountered Ms. Myers at the home; defendant was riot present at the home at that time., A.R., sixteen years old at the time of trial, admitted that when she was nine, she told Ms. Deviney something about her “dad ... touching [her] or something,” but that the night before, her sister, R.G;, “told [her] to tell something.” A.R. explained that R.G. threatened her, telling her if she did not tell, R.G. would “kill [her].” At trial, A.R. testified that her father never touched her and that she had lied to Ms. Deviney when she told her that he did. ■ R.G., twenty-one years old at the time of trial, testified that she started living with defendant in 2009 when she was fourteen; prior thereto, she lived with her mother and stepfather. She stated that her stepfather was physically abusive to her and her mother, which is why she went to live with defendant. She explained that she liked living with her- father until “weird stuff’ started happening. She elaborated that defendant told her he wanted her to be the “woman of the house,” and that at night before bed, he tried to kiss her on the mouth instead of oil her cheek. She explained that “he’d try to get a ktés, and it was weird. It was always when Ms. Penny wasn’t home.” She testified that she talked to A.R. about the “weird stuff,” and A.R. told her that defendant “tried to put it in her butt one time.” R.G. expressed to A.R. the need to tell somebody, but did not say anything right away. She expressly denied threatening A.R. about telling' someone. R.G. described that a few nights later, defendant came into her room and started to “tickle [her].” She recalled that defendant rolled her over onto her stomach, “climbed over [her]” and tried to pull her pants down; she was holding them, and he pulled them “down hard” and it “hurt [her] finger.” She testified that “he then started to have intercourse with [her].”‘ She elaborated, stating, “he stuck his thing inside of me ... [his] penis ... in my vagina.” She described that she did not “do nothing because [she] was scared,” and that “it hurt,” and that she did not Uscream “because [she] was scared” and “didn’t know what was going to happen” if she had screamed. She described that she just “laid there” with “tears in [her] eyes.” After “he was finished,” defendant left her room and went to his bathroom. She rolled over on her bed and touched something wet, and when she turned on the -light, saw a “big white spot” on her sheets. She put a pillow over it and “just laid there.” She described that the next morning, she noticed blood in her underwear, and “tried to wash them out” and hung them in her bathroom. At school that day, she “didn’t do nothing,” but eventually realized that if she stayed quiet, “it just might continue,” and so she told Ms. Deviney. R.G. described that after the disclosure, after she spoke with police and DCFS, and after she was placed in a foster home, she “started losing it,” and was placed in a mental hospital. She explained that she “felt disgusting” and “hated [herself] for a while ... and blamed [herself] for the longest.” She- also testified that she tried to commit suicide “a couple of times.” Penny Myers Ramey testified that she met defendant when she was seventeen. At first she and defendant were friends, and “it turned into a relationship.” She ultimately moved in with defendant, who was approximately thirty-three at the time, arid A.R. at his home at 6404 Kawanee Avenue. She recalled that at some point, R.G. moved in. Ms. Myers recalled that “it seemed like [R.G.] was excited to finally meet her dad,” but then “it progressively got worse over time.” She generally described their home life—the girls had to clean their rooms and do daily chores. She testified that defendant told the girls there were cameras in the home, even though there were none, as a “scare tactic.” She described “odd” conversations she and defendant had about R.G.—defendant would tell her “what can you do for me that my daughter can’t?” She testified that “as a young woman ... [she] never really understood it until now ... [it] makes a lot more sense now.” She recounted that one time, she saw that R.G. had a |R“passion mark” or “hickey” on her neck, that defendant explained was the result of her little brother, who was visiting at the time, kicking her in the neck. It struck her as odd, though, that defendant had R.G. put a “frozen spoon on it,” and that later, defendant changed the story and told her “there were boys running in and out of the house” that the girls were sneaking in. Ms. Myers testified that on March 1, 2010, when she arrived home after work and R.G. was- not home, she and A.R. walked to the school; she figured that [R.G.] was there because she “would normally go to counseling with Ms. Deviney.” She arrived at the school and encountered R.G. in Ms. Deviney’s office crying. Defendant arrived at the school soon thereafter, and Ms. Deviney told them about the allegations. Ms. Myers testified that defendant “said that he had to go to the house and [R.G.] was making up stories. So he told [her] to follow him. And at that point [they] went to the house, and [defendant] took [R.G.] ’s sheets off her bed and put them in the washer.” She recalled that defendant showed her the stains, that she recognized as semen, on the pillowcase and bedsheets, and he blamed “those boys sneaking into the house” for the stains saying that he “didn’t want to get blamed for it.” She testified that he put the linens in the washer and told her that “he had to get out of there before he got blamed for something.” She elaborated that she thought he had a warrant at the time, which was “why he explained why he was running.” She explained that she put the sheets back on R.G.’s bed after they finished drying. R.G.’s bed sheets and comforter were seized as evidence pursuant to the search warrant executed later on March 1, 2010. Detective Fernandez elaborated that R.G.’s sheets from her bed, including the fitted sheet, flat sheet, pillow case, and comforter were seized, as well as the pair of green underwear that R.G. had hung in her bathroom. Dr. Mark Carbon, an emergency room physician at Children’s Hospital, testified that on March 1, 2010, he met with and examined A.R. and R.G. He |7performed a Physical Evidence Recovery Kit (“PERK”) on each of the girls, which included a number of swabs on specific areas to collect the evidence. He testified that he did not observe any physical injuries to their genitals; he explained that their exams were “completely normal, which is typical in most sexual abuse cases.” Staci Lanza Hughes worked at the Jefferson Parish Child Advocacy Center as a forensic interviewer in 2010. She conducted a forensic interview with both A.R. and R.G. on March 12, 2010. The video of each girl’s forensic interview was published to the jury. In the video, R.G. gave statements consistent with her earlier disclosure. Anne Troy, qualified as an expert as a pediatric nurse practitioner, specializing in child maltreatment, including physical, mental, and sexual abuse, testified that while she did not personally examine A.R. and R.G., she reviewed documents related to this case. She explained generally that in her experience, behavioral issues are common in children who have been victims of sexual abuse. She concluded that while there were no physical findings of sexual abuse related to R.G., she found that R.G. gave a “clear, detailed history of sexual abuse” by defendant. Also in R.G.’s case, she has had behavioral issues—“suicide ideations, the suspensions from school, the issues with anger and authority.” Ms. Troy also explained that recantation is considered part of the process of disclosure because “what happens with an outcry and when children start to say things, they realize mom’s crying, that there’s people in their life who want to look at their private parts” and “they’ll take it back to protect the adults” or because “they just want it all to stop.” Pamela Williams Cyprian with the Jefferson Parish Sheriffs Office Crime Lab, who was qualified as an expert in the field of serological analysis of bodily fluids, first explained that serology is the study of serum, and more particularly,J^forensic serology involves the identification of bodily fluids, such as blood, sémen, and saliva. She testified that she performed a serological analysis on certain pieces of evidence in this case. She described that, she performed an acid phosphatase test, and explained that acid phosphatase is an enzyme present in seminal fluid, so “it makes it a good screen test for semen.” She further explained that she first looked at R.G.’s PERK test, and found that both the genital swab and vaginal swab were positive for acid phosphatase, All the swabs from A.R.’s PERK test were negative for acid phosphatase. She tested R.G.’s fitted sheet which was negative for the presence of blood and semen. She also tested R.G.’s flat sheet, pillowcase, and comforter,- and several of the stains were positive for acid phosphatase. She did further tests on the flat sheet, determining'it was positive for seminal fluid. Also, looking through a microscope, she was able to locate sperm on-th'e flat sheet, pillowcase, comforter, and the genital swab from R.G.’s PERK test. Sarah Serou, a forensic DNA analyst with the Jefferson Parish Sheriffs Office DNA Lab, conducted DNA analysis in this case. She received reference samples from defendant, A.R., and R.G. From the pillowcase, she tested a sperm fraction-rthe DNA profile obtained was consistent with a singular contributor, but because of the limited quantity of DNA, no conclusion could be made regarding the contributor status of defendant. From the sheet, she tested an epithelial fraction (skin cells)— the DNA profile was a mixture with the major contributor being consistent with R.G., but the minor contributor was at too low a concentration to determine a valid DNA profile. From the comforter, she tested an epithelial fraction—the DNA profile was consistent with being a mixture of R.G.’s and defendant’s DNA. Other sperm fraction samples from the comforter, sheet, and pillowcase were tested and were consistent with defendant’s DNA profile. Detective Fernandez testified that when he received the information that the DNA profile from the bedding was consistent with defendant, he applied for an arrest | ¿warrant on February 1, 2012, He was notified that defendant was arrested on the warrant in August 2014.[7] Defendant presented the testimony of several witnesses in his defense. His brothers (Charlie and Nathaniel), sister-in-law (Tara Seaberry), and mother (Judy Peters), all testified regarding how R.G. first came to stay with -defendant. Charlie recounted that in 2009, when R.G. was living in Mississippi with her mother, she called him because she was “in trouble,” and -he went to pick 'her up the next day. Nathaniel described that there was “some kind of altercation” in 2009, and Tara explained that they “had to get her because there was abuse.” After, she lived with Nathaniel and Tara for approximately two . weeks, then with Charlie for a while, then..with Ms. Peters before she started living with defendant. Charlie testified that A.R. currently lives with him; he stated that he has not talked with her about the case,- but described that “over the years she’s had some episodes.’’ Charlie used to speak with R.G., but stopped because “it got really uncomfortable” arid “some of the things she was saying” “didn’t make sense,” ASSIGNMENT OF ERROR - NUMBER ONE ■ " ■ Sufficiency of the evidence In his first assignment of error, defendant argues that the evidence was insufficient to support the conviction. He asserts that the only evidence the State presented was R.G.’s uncorroborated testimony. Defendant claims that the residual sperm and DNA found on the flat sheet could not be date stamped as to when it was left there. He contends that since DNA remained after the sheets were admittedly laundered, it could have been from when the sheet was conceivably used by defendant and Ms. Myers. Defendant argues that -the flat sheets ■ and | mpillowcases were not proven to be exclusively used by anyone. Defendant concludes that the evidence was insufficient to support the requisite elements of the crime charged. The State responds that the victim gave a detailed and consistent account of events that established beyond a reasonable doubt all of the. elements of .the crime of forcible rape. The State relies on the victim’s testimony that defendant rolled her over onto her stomach and tried to pull her pants down, that she held onto her pants and tried to resist, but defendant pulled them down hard, hurting her fingers, and started to have sexual .intercourse with her. Moreover, the State adds that the victim’s account was corroborated by the findings of the serological and DNA analysts. Also, the State asserts that the testimony of Ms. Myers also corroborates the physical evidence concerning .the stains on the bedding,. In reviewing sufficiéncy of the evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-674 (La. 6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002); State v. Mickel, 09-953 (La. App. 5 Cir. 5/11/10), 41 So.3d 532, 534, writ denied, 10-1357 (La. 1/7/11), 52 So.3d 885. This directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact’s rational credibility calls, evidence weighing, and inference drawing. State v. Caffrey, 08-717 (La. App. 5 Cir. 5/12/09), 15 So.3d 198, 202, writ denied, 09-1305 (La. 2/5/10), 27 So.3d 297. This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is | T1 contrary to the weight of the evidence. Id. As a result, under the Jackson standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at trial established guilt beyond a reasonable doubt, but.whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. State v. Jones, 08-20 (La. App. 5 Cir. 4/15/08), 985 So.2d 234, 240. In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. Caffrey, supra. Indeed, the resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. See State v. Bailey, 04-85 (La. App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied, 04-1605 (La. 11/15/04), 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005). Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Dixon, 07-915 (La. App. 5 Cir. 3/11/08), 982 So.2d 146, 153, writ denied, 08-0987 (La. 1/30/09), 999 So.2d 745. Moreover, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. State v. Bruce, 14-877 (La. App. 5 Cir. 3/25/15), 169 So.3d 671, 675, writ denied, 15-833 (La. 3/4/16), 187 So.3d 1007. In the instant case, defendant was charged with and convicted of forcible rape. At the time of the offense in 2010, La. R.S. 14:42.1 defined forcible rape, in pertinent part, as: [R]ape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed ... [w]hen the victim is prevented from resisting the act by force or threats of physical violence under circumstances whei-e the ^¿victim reasonably believes that such resistance would- not prevent the rape. Rape is defined as “the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person’s lawful consent.” See La. R.S. 14:41. Any sexual penetration, however slight, is sufficient to complete the crime, and emission is not necessary. See La. R.S. 14:41(B). The testimony of the victim can be sufficient to establish sexual penetration, even though there is an absence of scientific evidence of sexual intercourse. State v. Hawkins, 06-739 (La. App. 5 Cir. 9/25/07), 968 So.2d 1082, 1088, writ denied, 07-2272 (La. 4/18/08), 978 So.2d 347. Defendant argues that R.G.’s testimony was insufficient to support his conviction because it was uncorroborated. For the following reasons, we disagree. First, the testimony of a victim need not be corroborated to support a conviction. Indeed, it is well settled that a victim’s testimony alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. State v. Bruce, supra.[8] Here, R.G. testified that when she was fourteen, defendant came into her room, started tickling her, rolled her. onto her stomach, forcefully'pulled-her pants down, and had vaginal intercourse with her. She described that she tried to hold up her pants as to resist defendant, but he pulled them down hard, hurting her fingers. She described that it hurt, and because she was seared, she did not scream; she “didn’t know what was going to happen” if she had screamed. She also said she did- not know what would happen if she tried to stop him—“maybe he would [have] grab[bed] [her] mouth or something.” When asked if she thought she could | tjjhave stopped him, R.G.. replied, “I don’t know, -I don’t know. But I could not.” Dr. Carbon explained during his testimony that normal exams are typical in most sexual abuse cases. Ms. Troy also explained that the tissue around the- opening to the vagina heals very quickly, so she “know[s] 95 percent of the children [she’s] going to look at, despite whatever the allegations are, will be normal.” , In State v. Carter, 04-482 (La. App. 5 Cir. 10/26/04), 888 So.2d 928, 934-35, this Court upheld the defendant’s conviction for forcible rape and found the evidence of the element of force was sufficient where the victim, who was 14 years old at the time of the incident, testified at trial 'that the defendant, an adult who was larger and stronger than her, picked her up out of bed and carried her to his bedroom, despite her verbal protests. She further testified that the defendant pushed her into a reclining position on his bed and pinned both of her hands behind her back. When she tried to free her hands, the defendant gripped them tighter. The victim also testified at trial that the defendant put his penis into her vagina. Id. Second, testimony need not be uncontra-dieted to support a conviction. The resolution of conflicting or contradictory testimony is one of the fundamental tasks for the trier of fact; who may accept or reject, in whole or in part, the testimony of any witness. See State v. Bailey, supra. In this case, the jury clearly believed R.G.’s testimony in rendering its verdict. Moreover, in this case, sperm was found from R.G.’s genital swab taken the following day and defendant’s semen was found on R.G.’s sheet, pillowcase, and comforter from her bed. Based on the foregoing, we find that a review of the record reveals that the evidence, when viewed in the light most-favorable to the prosecution, was sufficient for a rational trier of fact to have found defendant guilty of forcible rape and to support his conviction. ) ^ASSIGNMENT OF ERROR NUMBER TWO Failure to grant a mistrial In this assignment of error, defendant argués that the trial court erred in failing to grant a mistrial after allegedly improper comments were made by the prosecutor during closing argument's. Here, defendant asserts that the prosecution improperly commented on defendant’s right to remain silent and not testify. Specifically, defendant -points to the State’s comments in closing argument saying that the defense “can call witnesses, just like us. And we talked about in voir dire that he can testify just like any other witness.” He avers that once the jury heard this comment, the nearly unavoidable inference made a fair trial unlikely since defendant exercised his right to not testify. Defendant contends that this error was not harmless because it was so prejudicial, as it depicted defendant as unwilling to testify and defend himself against the allegations. Defendant claims that the State implied to the jury that defendant would have testified if he was not guilty of the allegation. Therefore, defendant argues that the jury’s verdict cannot be considered unattributable to the error and that the trial - court erred in denying the motion for a mistrial. The State first responds that because defendant did not make a contemporaneous objection or motion for a mistrial after the. alleged prejudicial comment, the issue is precluded from review. The State further argues -that relief would still not be warranted on the merits because the comment was not an improper comment on the failure of defendant to testify'in his own defense, but rather a rebuttal to a specific argument raised by the defense. The State contends that the comment viewed in context-was confined to rebutting the argument directly raised by the defense in its closing argument. Moreover, the State, assuming arguendo that the brief remark was improper; avers that the jury would |1finot have been influenced by the prosecutor’s comments, and the. comments would not have contributed to the verdict in any way. The transcript reflects that during closing arguments, defense counsel argued: . But I -think there’s also some important parts of this story that you don’t know, things that are definitely there and that you haven’t heard about. [[Image here]] You heard a lot of talk about OCS coming ... Mr. Banam [sic] was the one. ... Where was he? ... [Wjhat’s his story and ... why don’t they want to let you hear it? [[Image here]] You know who else you didn’t hear from is my client, because he chose not to testify. But you also know that he talked to the .detectives. And he gaye a statement. But you didn’t hear that statement. They didn’t want you to .know about that. They didn’t want you, to know about what he said. During its rebuttal closing argument, the State responded: We didn’t choose to call [Troy Baham] as a witness. Not hiding it; we just— we’ve been here four days folks .,. [w]e could be here for two weeks, call everybody that was involved in this, but we decided not to do that. Defense counsel told you “they didn’t want you to hear from my client, they didn’t want you to hear his statement,” right? They called witnesses, They can call witnesses, just like us. -And we talked about in voir dire that he can testify just like every other witness. There are rules in court about evidence, about what can come in, how it can come in, and who can bring it in. And basically it comes down to you -have to have personal knowledge, and -you can’t bring in .statements from out of court. You’ve.got to come in here and say it on'the witness stand. . It is noted that defense counsel , did not object nor move for a mistrial during -rebuttal. The transcript further- reflects that during closing jury instructions, defense counsel asked if they could approach the bench. During this bench conference, defense counsel moved for a mistrial. Defense counsel argued that during the State’s closing argument there-was “an inference that the Defendant could or |1Sshould have taken the stand. [The State] said they can call witnesses. and ... [defense- counsel] felt that that was an inference against [his] client for not taking -the stand.” The State countered that it “was responding specifically to .... when [defense counsel] said that the State didn’t call specific witnesses to the stand,” that “they didn’t .want [the jury], to hear from these witnesses that were important.” The State expounded that defense cqun-sel did in fact call witnesses, but not the specific witness .defense counsel mentioned. The State further responded that it was “accused of hiding the Defendant’s statement that was made,” but did not state that “he had to take the stand or he could have taken the stand.” The State explained that it was in “direct response to the accusation that [it was] hiding evidence from the jury.” The trial court denied defendant’s request for a mistrial. First, we find that defendant did not properly preserve this issue for appellate review since he did not contemporaneously object to the alleged inflammatory statement made by the State. Defendant moved for a mistrial following closing arguments while the trial court was instructing the jury on the applicable law. This Court has previously held that a defendant who fails to object until the judge is preparing to instruct the jury has not contemporaneously objected as required by La. C.Cr.P. art. 841.[9] In State v. Spencer, 93-571 (La. App. 5 Cir. 1/25/94), 631 So.2d 1363, 1369, the defendant argued that the trial court erred in denying his motion for a mistrial after closing argument. This Court noted that the defense objected after the State had concluded its rebuttal instead of immediately when the contested statement was made. This Court stated that the failure to contemporaneously object prevented the trial court from immediately remedying the situation if corrective action had been necessary. J^Similarly in State v. Paul, 15-501 (La. App. 5 Cir. 1/27/16), 185 So.3d 188, 201, this Court, citing State v. Spencer, supra, found that the defendant’s failure to object during or after the State’s closing arguments prevented him from raising the issue on appeal. This Court found that since defendant did not contemporaneously object to the alleged.inflammatory statement made by the State and only moved for a mistrial, after the jury had retired for deliberation, the trial court did not have the opportunity to remedy the situation had corrective action been necessary. Therefore, we find that defendant is precluded from raising this issue on appeal. In any event, for the following reasons, this assignment of error is without merit. The general rules governing closing and rebuttal argument are set forth in La. C.Cr.P. art. 774 which provides: The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law.applicable to the case. The argument shall not appeal to prejudice. The state’s rebuttal shall be confined to answering the argument of the defendant. The prosecutor has considerable latitude in making closing arguments; however, this latitude is not without limits. State v. Greenup, 12-881 (La. App. 5 Cir. 8/27/13), 123 So.3d 768, 776, writ denied, 13-2300 (La. 3/21/14), 135 So.3d 617; State v. Uloho, 04-55 (La. App. 5 Cir. 5/26/04), 875 So.2d 918, 927, writ denied, 04-1640 (La. 11/19/04), 888 So.2d 192. The trial judge has broad discretion in. controlling the scope of closing arguments. Upon motion of a defendant, a mistrial shall be ordered “when a remark or comment, made within the hearing of the jury by the ... district attorney ... in argument, refers directly or indirectly to .., [t]he failure of the defendant to testify in his own defense[.]” La. C.Cr.P. art. 770(3). When a direct reference is made by [1Rthe State to the defendant’s failure to take the stand, a mistrial should be de-dared regardless- of whether the State intended for the jury to draw unfavorable inferences from the defendant’s silence. State v. Theriot, 07-71 (La. App. 5 Cir. 6/26/07), 963 So.2d 1012, 1021-22, writ denied, 07-1598 (La. 2/1/08), 976 So.2d 715. But when the State makes an indirect reference to the defendant’s failure to testify, the trial court must determine whether the remark’s intended effect on the jury was an impermissible reference to the defendant’s failure to testify or a permissible reference in a general statement that the State’s case was unrebutted. Id. An indirect reference only'requires a mistrial if the comment was intended to draw the jury’s attention to the defendant’s failure to testify. State v. Lai, 04-1053 (La. App. 5 Cir. 4/26/05), 902 So.2d 550, 560, writ denied, 05-1681 (La. 2/3/06), 922 So.2d 1175. The mandatory mistrial provisions of Article 770, which encompass a prosecutor’s direct or indirect comment on the defendant’s failure to testify, are directives to the trial judge and do not preclude an appellate court from conducting a harmless error analysis. State v. Thomas, 05-2373 (La. 4/17/06), 926 So.2d 490 (per curiam). A conviction will not be reversed due to improper remarks during closing argument unless the reviewing court is thoroughly convinced that the remarks influenced -the jury and contributed to the verdict. State v. Jackson, 04-293 (La. App. 5 Cir. 7/27/04), 880 So.2d 69, 73, writ denied, 05-0232 (La. 5/6/05), 901 So.2d 1094. See also State v. Greenup, 123 So.3d at 775-76. In making its determination, the appellate court should give credit to the good sense and fair-mindedness of the jury that has seen the evidence and heard the argument and has been instructed that the arguments of counsel are not evidence. State v. Jackson, supra. A mistrial is a drastic remedy anc¡ ⅛ warranted only when trial error .results in substantial prejudice to the defendant that deprives him of a reasonable | ^expectation of a fair trial. Whether á mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of that discretion. State v. Davis, 12-512 (La. App. 5 Cir. 4/24/13), 115 So.3d 68, 79, writ denied, 13-1205 (La. 11/22/13), 126 So.3d 479. In this assigned error, defendant argues that a mistrial was warranted because the prosecutor’s remark was a reference to defendant’s failure to testify. The comment to which defendant refers is the State’s comment in closing rebuttal argument saying that the defense “can call witnesses, just like us. And we talked about in voir dire that he can testify just like any other witness.” The aforementioned statement does not directly mention defendant’s failure to take the stand. Further, the State’s remark was in direct response to an argument made by defense counsel. In State v. Johnson, 10-209 (La. App. 5 Cir. 10/12/10), 52 So.3d 110, 127-28, writ denied, 10-2546 (La. 4/1/11), 60 So.3d 1248, the defendant argued that the trial court erred in failing to grant a mistrial when the State, in its rebuttal closing argument, commented on his failure to call any witnesses or to testify at trial. The State responded that the prosecutor’s comment was not intended to call attention to defendant’s failure to testify at trial, but rather was a response to defense counsel’s statement in closing argument that the prosecution had failed to present evidence that defendant sold narcotics to the three people he met with on the street corner. In Johnson, the defendant referred to the following excerpt from the prosecutor’s rebuttal closing argument: The defendant was on a street corner some two miles from his house in a high crime, high drug area on Monday, October the 8th at 10 something at night. And if you believe what defense counsel is arguing, he was greeting friends; not selling cocaine. |2qNow, you cannot—the defendant doesn’t have to do anything and you can’t hold it against him if he doesn’t do anything and doesn’t call any witnesses. This Court noted that although the defendant was correct in noting that the State generally cannot comment upon his failure to testify, in the proper context, the State’s mention of a defendant’s constitutional privilege against self-incrimination is not considered an impermissible comment on the defendant’s failure to testify at .trial. For instance, the Louisiana Supreme Court has held that during voir dire, the State may mention the defendant’s constitutional privilege against self-incrimination. State v. Shea, 421 So.2d 200, 206 (La. 1982), rev’d on other grounds, 470 U.S. 51, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985). See also State v. Packnett, 04-709 (La. App. 5 Cir. 12/28/04), 892 So.2d 615, 622-24, writ denied, 05-0599 (La. 6/3/05), 903 So.2d 455. In finding that this assignment lacked merit, this Court in Johnson'could not say that the prosecutor was commenting on the defendant’s failure to testify, but rather it appeared that the prosecutor was responding to defense counsel’s closing argument. In State v. Williams, 14-40 (La. App. 5 Cir. 9/24/14), 151 So.3d 79, 82-85, writ denied, 14-2250 (La. 6/19/15), 172 So.3d 649, the defendant argued that a mistrial was warranted because the prosecutor’s remark was an oblique reference to defendant’s failure to testify. The defendant referenced the following statement made by the prosecutor during closing rebuttal argument: I don’t know if Ms. Sheppard and Mr. Louque [defense counsel] want me to bring in everybody in the neighborhood, ... I don’t know if they want me to bring everybody in, but it is not our obligation. We were not asked to do that. We are asked to prove the elements of each of the crimes beyond a reasonable doubt. We have done that over the course of the last two days. Mr. Louque and Ms. Sheppard had Mr, Bailey under subpoena. They could have— 121This Court found that the State’s comment . during rebuttal about defendant’s subpoena power did not constitute either a direct or an indirect reference to defendant’s failure to testify, and found that, considering the prosecutor’s remarks in context, the comments in rebuttal were in response to defense counsel’s remarks during closing argument, and as such, a mistrial was not warranted. In State v. Cleveland, 14-1034, 2014 WL 7332135, 2014La. App. Unpub. LEXIS 744 (La. App. 1 Cir. 12/23/14),[10] during closing arguments, defense counsel made an issue of the State’s failure to call various witnesses, including the victim’s boyfriend and the doctor who performed the victim’s rape kit, as well as the State’s failure to admit the rape kit into evidence. In its rebuttal closing argument, the State explained that the victim’s boyfriend was not called to testify because he was not at the trailer at the time of the incident. The prosecutor went on to explain: Let’s go back to the rape kit. Did I hide it from you? No, I didn’t. I -told you it didn’t follow protocol. The State Police, they’re required .to follow protocol. That’s why we have them. Oh, you didn’t hear from the doctor. Well, guess what? The rápe kit, we couldn’t get it. tested. So guess what? We couldn’t put. it into evidence and you couldn’t conclude anything from it because there was no testing done on it. So, again, we could of [sic] paraded another witness in here, kept you here probably throughout the weekend, for evidence that would not have been admissible, in this case because it couldn’t be tested in accordance with protocol. We didn’t hide that. And the other thing I want to tell you about this lack-of-evidenee argument and who we didn’t hear from, from [defense counsel]. The Defense, certainly, has the ability to subpoena and call any witnesses that they like. The, appellate court found, that the challenged statement, reviewed in context, indicated that rather than alluding to the defendant’s failure to testify, the State was responding to defense counsel’s arguments made during his closing statement. The court found that the defense, with its. closing argument, opened the door for this line of rebuttal by the State, citing La. C.Cr.P. art. 774. 12aIn the present matter, we find that the State, in making the challenged statement, did not intend to' 'draw the jury’s attention to the defendant’s failure to testify, but rather it intended to respond directly to the arguments made by defense counsel. Based on the foregoing, we -find that the trial court'did not abuse its discretion in denying defendant’s motion for a mistrial. This assignment of error is without merit. ERRORS PATENT REVIEW ■ The record was reviewed for errors patent, according to La. C.Cr.P. art. 920, State v. Oliveaux, 312 So.2d 337 (La. 1975), and State v. Weiland, 556 So.2d 175 (La. App. 5 Cir. 1990). The following matter is noted, but no corrective action is required. At the time of the offense, forcible rape was punishable by imprisonment' at hard labor for not less than five years nor more than 40 years. The statute further provided that at least two years of the sentence imposed be without the benefit of probation, parole, or suspension of sentence. See La. R.S. 14:42.1(B). The record indicates that- the trial court imposed an illegal sentence by not imposing restrictions when the statute required that at least two years of the sentence be served without the benefit of parole, probation, or suspension of sentence. Usually such an omission is corrected as a matter of law by virtue of La. R.S. 15:301.1. See State v. Williams, 10-265 (La. App. 5 Cir. 11/9/10), 54 So.3d 98, 105-06. However, in this case, the restriction of benefits was within the trial court’s discretion, as the statute mandates that “at least two years of the sentence” be without benefits, (Emphasis added.) However, .defendant’s sentence was later vacated, and defendant was resentenced under La, R.S. 15:529.1. As such, any patent error relating to this sentence is considered moot.[11] See State v. Smith, 09-100 (La. App. 5 Cir. 8/25/09), 20 So.3d 501, 502, writ denied, 09-2102 (La. 4/5/10), 31 So.3d 357. CONCLUSION For the foregoing reasons, defendant’s conviction and sentence are affirmed. AFFIRMED . ■ La. R.S. 14:42.1 was recently amended in 2015 by Act No. 184, which, renamed the crime as "second degree rape.” . See Errors Patent Review, infra, regarding restriction of benefits. . The victim, R.G., who was a minor at the time of the sexual offense, and the victim's family will be referred to by their initials in this opinion, pursuant to this Court’s policy to protect the identities of minor victims and victims of sexual offenses. La. R.S. 46:1844. . While R.G. went to school at John Quincy Adams Middle School and not Bissonet Elementary at-the time, she would .go there for counseling with Ms, Deviney., . The spelling of Ms. Myers' last name appears as both "Myers” and "Meyers’.' throughout the transcript. She also is referred to by her married name “Ramey.” For purposes of this opinion, she will be referred to as "Ms. Myers,” . The Department of Child and Family Services is also referred to as “OCS” throughout the transcript. . The record reflects that at the time Sergeant Fernandez applied for a warrant, defendant was already in the custody of the Department of Corrections, Also, during cross-examination, Sergeant Fernandez testified that he conducted a taped interview with defendant in May 2010. However, the trial court ruled that statement was inadmissible by the defense, as defendant "want[ed] to use his self-serving statement in lieu of testifying and thus avoid cross-examination.” . In State v. Wallace, 00-1745 (La. App. 5 Cir. 5/16/01), 788 So.2d 578, 584, writ denied, 01-1849 (La. 5/24/02), 816 So.2d 297, this Court found the evidence was sufficient to support a conviction for forcible rape, despite the absence of physical evidence, where the victim identified defendant as the perpetrator, and a physician explained the reasons for the lack of such evidence. . La. C.Cr.P. art. 841 provides: An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of me court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor. , It is noted that this case is published on the First Circuit's website, and therefore, may be cited as authority despite the fact it is not designated for publication. See La. C.C.P. art. 2168; State in the Interest of S.L., 11-883 (La. App. 5 Cir. 4/24/12), 94 So.3d 822, 827 n. 2. . It is noted that when the trial court resen-tenced defendant under the habitual offender statute, -it imposed a thirty-year sentence without the benefit of parole, probation, or suspension of sentence. The habitual offender statute, La, R.S. 15:529.1(G), provides that any sentence imposed under its provisions "shall be at hard labor without benefit of probation or suspension of sentence." Thus, the habitual offender statute does not impose a parole restriction. Nevertheless,, the underlying offense in the reference statute, La. R.S. 14:42.1, imposes a parole restriction. It requires that at least two years of the sentence imposed shall be without the benefit of probation, parole, or suspension of sentence. The restrictions on parole eligibility imposed on habitual offender sentences under La. R.S. 15:529.1 "are those called for in the reference statute.” State v. Esteen, 01-879 (La. App. 5 Cir. 5/15/02), 821 So.2d 60, 79, n. 24, writ denied, 02-1540 (La. 12/13/02), 831 So.2d 983. Thus, in sentencing under the habitual offender statute, the trial judge did not err in imposing the entire thirty-year sentence without the benefit of parole, probation, or suspension of sentence.