STEPHEN J. WINDHORST, Judge.
| aDefendant, Terrence Payne, was charged by grand jury indictment with aggravated rape, La. R.S. 14:42, and attempted second degree murder, La. R.S. 14:27/30.1. After a jury trial, he was convicted of one count of forcible rape, La. R.S. 14:42.2, and one count of attempted manslaughter, La. R.S. 14:27/31. The trial court sentenced defendant to imprisonment at hard labor for forty years without *350 benefit of probation, parole, or suspension of sentence on count one and imprisonment at hard labor for twenty years on count two, with both sentences to run consecutively to one another. Thereafter, pursuant to a habitual offender bill, the trial judge found defendant to be a second felony offender and vacated the original sentences on counts one and two. Defendant was resentenced under the habitual offender statute to imprisonment at hard labor for sixty years without benefit of probation or suspension of sentence on count one and imprisonment at hard labor for twenty-five years without benefit of probation or suspension of sentence on count two, with both sentences to run consecutively to one another. |sWe affirm defendant’s convictions and the sentence imposed for attempted manslaughter (count two). We vacate the sentence imposed on count one and remand for resen-tencing in accordance with this opinion.
FACTS
The following facts were developed at trial. On June 22, 2012, defendant and the victim, T.N.,[1] entered a storage yard at 5030 Alice Street in Marrero, Louisiana. Defendant then physically and sexually assaulted her, causing serious and permanent injuries. At trial, T.N. testified that she had thirty-two broken bones on the left side of her face and a crushed eye socket. She explained that doctors had to take a bone from her skull to rebuild her eye socket. T.N. asserted that her sense of smell never came back, that she still had problems with her head and left eye, that she had to undergo many surgeries, and that she had to have dental work done as she no longer had real teeth.
T.N. testified at trial that she was in a bad car accident in 2004, after which she became addicted to opiates and then to heroin. To support her heroin addiction, she turned to stealing and prostitution. On June 22, 2012, T.N. was staying in Room 31 at the Luxury Inn with a male friend who allowed her to stay there in exchange for money or drugs. When she awakened on that date, T.N. felt sick, so she left the room to try to obtain some money for heroin. As she was walking from the Luxury Inn toward Fourth Street, defendant approached her and asked if she knew a “working girl.” T.N. told defendant that she was a “working girl,” and she agreed to have sex with defendant in exchange for money. After-wards, they went to the Luxury Inn, Room 31, but defendant was uncomfortable because there was another man in the room. Therefore, T.N. and Rdefendant left the room and walked down the street.[2] As they were walking, defendant said that he wanted to go into the storage yard. Even though the gate was locked, defendant opened it, and the two of them entered the yard. T.N. explained that they went to “like a shed” under a “car porch” in the back of the yard. As T.N. was putting her purse down, defendant came from behind, took her neck, and “popped” it. T.N. fell to the ground and could not move because her arms and legs felt “heavy.” She gasped for breath, and defendant told her *351 to “shut up,” and he “popped” her across her head. Afterward, defendant stripped off her clothes and took out a condom. Defendant held her on the ground and put the condom on. He had his arm “nailed” on her back and his knee on her back, and he began having vaginal sexual intercourse with T.N. from behind. T.N. started talking, but defendant said, “Bitch, shut up. Put your head down. Don’t look me in my face.” T.N. testified that defendant then pulled things off of a shelf, “some kind of heavy equipment,” and that he must have hit her in the head with a heavy object because she was knocked unconscious. T.N. further testified that she did not consent to having sex with defendant in this manner.
When T.N. woke up, she pushed dirt off of her body and started crawling. She explained that she could not stand up because her face was “heavy,” metal was falling from her face, and her teeth were in her throat. T.N. pushed her body up with her arms so she could go where she needed to go to get noticed. A man subsequently approached her and asked who had done this to her. She could not see anything, but she found out later he was the owner of the yard.
lRCurtis Hinson testified that on June 22, 2012, at approximately 2:00 to 2:30 P.M., he went to the storage yard accompanied by his nine-year-old son and Freddie La-pine, an employee. Hinson unlocked the gates and backed in his trailer. When he did so, he heard a noise. Hinson looked up and saw a woman (later identified as T.N.) coming from underneath the overhang and moaning. He testified that her face had been beaten so badly he “could not tell she was human unless she was standing up.” The woman walked to the middle of the yard and sat down. Lapine got some water and rags from the truck, started washing the woman’s face, and tried to talk to her. Hinson called 9-1-1, and the police came.
Deputy Brent Coussou of the Jefferson Parish Sheriffs Office (JPSO) was dispatched to the scene. Deputy Coussou saw the victim, who was nude from the waist' down and had severe head trauma with a lot of blood in the facial area. Deputy Coussou explained that it was “definitely one of the most gruesome scenes” he had experienced in his twenty-six years in law enforcement.
JPSO Lieutenant Ralph Sacks testified that when he arrived at the scene, it had been secured, and the victim had been transported to the hospital. Lieutenant Sacks walked around the crime scene and located a large amount of blood-like product underneath an overhang in the rear area of the property. From underneath the overhang Lieutenant Sacks collected a tom green condom wrapper with blood spatter on it, the other side of the tom green condom wrapper, a human tooth, a pair of blue jeans turned inside out, a wig, a pair of flip-flop shoes, a purse with blood spatter on it, a used red condom,[3] a broken pair of glasses, and keys. Inside the purse were a phone, sixteen dollars, and the identification card of the victim, | f;T.N. Also found underneath the overhang were numerous items, including a battery, paint cans, and a four-wheeler with blood on them.
At trial, T.N. testified that she met with Lieutenant Sacks when she was released *352 from the hospital. She explained that she felt a lot of guilt and shame about what had happened. She further explained that she felt that what had happened was her fault because it would not have happened if she had not been “doing what she was doing.” However, T.N. stated that no one deserved “what he did.” T.N. testified that she was worried Lieutenant Sacks would not take her seriously if she told him how the incident started and that she was a prostitute, so she minimized the fact that she was a prostitute that day.
Approximately one year later, on June 7, 2013, while incarcerated for unrelated offenses at the Jefferson Parish Correctional Center (JPCC), T.N. viewed the person who attacked her and overheard his name, Terrence Payne (defendant).[4] On release, she provided Lieutenant Sacks with this information. After Lieutenant Sacks verified that the victim and defendant had both been incarcerated on that same date, he compiled a photographic lineup and showed it to T.N. She positively identified defendant as the perpetrator.
Lieutenant Sacks subsequently obtained an arrest warrant for defendant and went to the JPCC where defendant was still incarcerated. Defendant voluntarily accompanied Lieutenant Sacks to the detective bureau where Lieutenant Sacks advised him of his rights. Defendant waived his rights and gave a statement in which he initially denied having any contact with the victim. However, when |7confronted with the video and the condom, he admitted having sexual intercourse with the victim on the day in question, but denied harming her.[5] Afterward, defendant asked to see the scene of where the offense happened, so Lieutenant Sacks drove there after asking defendant to tell him where to go. When they arrived, defendant pointed out the location where he and the victim had been at the scrap yard.
DISCUSSION
In his first counseled assignment of error, and in his pro se assignment of error, defendant argues that the trial judge erred by denying his motion for new trial based on newly discovered evidence. He contends that during the time between the first sentencing and the habitual offender sentencing, defense counsel learned that the victim, T.N., and a man named “Bryan Baker” had been living at the Siesta Motel in a room that T.N. had rented for four months. Baker was allegedly selling drugs from this room, and was arrested for possession with intent to distribute those drugs on March 19, 2014, just prior to the April 8, 2014 trial in the instant case. The bill of information in that case was filed one day before the instant trial started. Defendant argues that this infor *353 mation constituted Brady or impeachment evidence and should have been disclosed to him prior to trial, since T.N. claimed at trial that she had changed her life and been drug-free for a year. T.N., however, was not arrested in that incident, nor was there any evidence brought forth that she had any involvement in the possession or intended sale of the drugs.
At trial, defense counsel asked T.N. when she had last used heroin, and she responded that she had been “clean a year now.” When asked if she was “clean” Isbecause she was on probation, T.N. explained that she was “clean” because she “asked for God. I asked the Lord to deliver me from drugs because I lost everything due to it except for my soul, so I had to learn that.”
The record reflects that on May 1, 2014, defendant filed a motion for new trial. In that motion, defendant argued that the State’s case depended on the credibility of the victim and that the victim testified at trial that her life had changed. Defense counsel only recently learned about the victim and Bryan Baker as related above, and that pursuant to Brady, the State should have notified defense counsel that the victim had been connected to the search of her room at the Siesta Motel and the finding of drugs.
La.C.Cr.P. art. 851 provides, in pertinent part, that a “motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.” La.C.Cr.P. art. 851(3) provides, in pertinent part:
The court, on motion of the defendant, shall grant a new trial whenever:
[[Image here]]
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guiltyU
La.C.Cr.P. art. 854 lists the necessary allegations for supporting a new trial motion based on newly discovered evidence. State v. Richoux, 11-1112 (La.App. 5 Cir. 9/11/12), 101 So.3d 483, 489, unit denied, 12-2215 (La.4/1/13), 110 So.3d 139. That article provides as follows:
A motion for a new trial based on ground (3) of Article 851 shall contain allegations of fact, sworn to by the defendant or his counsel, showing:
| a(l) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discovered before or during the trial;
(2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence;
(3) The facts which the witnesses or evidence will establish; and
(4) That the witnesses or evidence are not beyond the process of the court, or are otherwise available.
The newly discovered whereabouts or residence of a witness do not constitute newly discovered evidence.
Additionally, the jurisprudence also imposes four requirements on this motion: 1) the evidence must have been discovered since the trial; 2) failure to learn of the evidence at the time of trial must not be due to defendant’s lack of diligence; 3) it must be material to the issues at the trial; and 4) it must be of ' such a nature that it would probably produce an acquittal in the event of a retrial. Richoux, 101 So.3d at 489. The trial court’s application of these precepts to newly discovered evidence is entitled to *354 great weight, and its denial of a new trial will not be disturbed on appeal absent a clear abuse of that discretion. State v. Do, 13-290 (La.App. 5 Cir. 11/19/13), 130 So.3d 377, 388, writ denied, 13-2907 (La.6/20/14), 141 So.3d 285. In the evaluation of whether the newly discovered evidence warrants a new trial, the test employed is not simply whether another jury might return a different verdict, but whether the new evidence is so material that it ought to produce a verdict different from that rendered at trial. Id. at 389, citing State v. Molinario, 400 So.2d 596 (La.1981). Further, an application for a new trial on the ground of newly discovered evidence should be viewed with extreme caution. Riehoux, 101 So.3d at 489, citing State v. Jefferson, 305 So.2d 465, 468 (La.1974).
10In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the suppression by the State of evidence favorable to the accused after it receives a request for it violates a defendant’s due process rights where the evidence is material to either guilt or punishment, without regard to the good or. bad faith of the prosecutors. See also State v. Bright, 02-2793 (La.5/25/04), 875 So.2d 37, 41-42. The duty to disclose is applicable even where there has been no request by the accused. United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). The State’s due process duty to disclose applies to both exculpatory and impeachment evidence. State v. Kemp, 00-2228 (La.10/15/02), 828 So.2d 540, 545.
Evidence is “material” under Brady only if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense. A reasonable probability is one that is sufficient to undermine confidence in the outcome. State v. Wise. 13-247 (La.App. 5 Cir. 11/19/13), 128 So.3d 1220, 1228, writ denied, 14-0253 (La.9/12/14), 147 So.3d 703. A reviewing court determining materiality must ascertain “not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).
We find that defendant has not met all of the statutory and jurisprudential requirements necessary to support a successful motion for a new trial based on newly discovered evidence. The motion for new trial does not contain allegations of fact sworn to by defendant or his counsel showing the four items set forth in La. C.Cr.P. art. 854. Moreover, the information in question does not constitute Brady evidence, since that information is not material to either guilt or punishment in the [ninstant case, and there is no reasonable probability that the result of the trial would have been different if the evidence had been disclosed to the defense. Lastly, even though defense counsel did not know the information in question at the time of trial, defendant still received a fair trial since the trial was one that resulted in a verdict worthy of confidence. Kyles v. Whitley, supra.
In this case, there was strong circumstantial evidence presented at trial that defendant committed the crimes for which he was convicted. Although defendant said in his statement that he and T.N. had consensual sex in a trailer at the storage yard, T.N. testified that defendant raped and beat her underneath the overhang in the storage yard. Her testimony was corroborated by photographs of the crime scene taken underneath the overhang which show a great deal of blood, a tom *355 green condom wrapper with blood spatter on it, a human tooth, a pair of blue jeans turned inside out, a wig, a pair of flip-flop shoes, a purse with blood spatter on it, a used red condom containing defendant’s DNA, and a broken pair of glasses. The photographs also showed numerous other items underneath the overhang, including a battery, paint cans, and a four-wheeler with blood on them. Further, the jury was aware of T.N.’s character as she testified at length about her heroin addiction, cocaine use, prostitution activities, stealing, and previous convictions. There is no reasonable probability that the jury would not have convicted defendant if it had known that two years after the rape and beating, T.N. was staying in a motel room where drags were found, and T.N. was not arrested or charged in that case.
We therefore find that the trial judge did not err by denying the motion for new trial. These assignments of error are without merit.
In his second counseled assignment of error, defendant argues that error patent was committed in the habitual offender sentencing. He contends that the |1⅞⅛½1 judge erred by enhancing both counts even though they arose from the same conduct.
The Louisiana Supreme Court has held that La. R.S. 15:529.1 does not prohibit enhancing multiple sentences obtained on the same date arising out of a single criminal act or episode, and therefore all multiple sentences imposed after a single criminal act or episode can be enhanced under the Habitual Offender Law. See State v. Shaw, 06-2467 (La.11/27/07), 969 So.2d 1233, 1245. Thus, the trial judge did not err by enhancing the sentence imposed on each count. We find no merit in this assignment of error.
We have reviewed the record for errors patent, according to the mandates of La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990), and find the following which merits our attention.
The enhanced sentence on count one is illegally lenient. The record reflects that the trial judge ordered that the entire habitual offender sentence be served without benefit of probation or suspension of sentence as is required under La. R.S. 15:529.1(G). However, the underlying conviction on count one that was enhanced in this matter was for forcible rape in violation of La. R.S. 14:42.1, which mandates imprisonment at hard labor for not less than five nor more than forty years, at least two of which shall be served without benefit of parole, probation, or suspension of sentence. Because the underlying offense prohibits parole for at least two years, the habitual offender sentence is to likewise be imposed without parole, for at least two years. State v. Smith, 09-100 (La.App. 5 Cir. 08/25/09), 20 So.3d 501, 508-09, writ denied, 09-2102 (La.4/5/10), 31 So.3d 357. Since the trial judge did not restrict parole in any way in imposing the enhanced sentence, and the statute requires an exercise of the trial court’s sentencing discretion in limiting |iaparole eligibility, we vacate defendant’s enhanced sentence on count one and remand this case for resentencing in accordance with the underlying statute. See Smith, supra.
CONCLUSION
For the above discussed reasons, the defendant’s convictions and his sentence on count two are affirmed. The sentence imposed on count one is vacated and the case is remanded for resentencing in accordance with the underlying statute.
*356 CONVICTIONS AFFIRMED; SENTENCE ON COUNT TWO AFFIRMED; SENTENCE ON COUNT ONE VACATED AND CASE REMANDED FOR RE-SENTENCING ON COUNT ONE

. The victim's initials are used under the authority of La. R.S. 46:1844W(3), which allows the Court to identify a crime victim who is a minor, or a victim of a sex offense, by using his or her initials.

. Lieutenant Sacks testified that during the investigation, he went to the nearby Luxury Inn and obtained a videotape which showed that on June 22, 2012, at approximately 1:20 P.M. the victim left the motel. At 1:27 P.M. she returned to the motel with a black male, and at 1:29 P.M. she and the black male left the motel. Later, T.N. identified her companion in the video as the person who attacked her. However, at that time T.N. did not know the identify of the perpetrator.

. Lieutenant Sacks obtained a search warrant, then obtained buccal cell samples from defendant. He also obtained a reference cell sample from the victim. David Cox, an expert forensic DNA analyst, testified that in his opinion, a mixture of the DNA of T.N. and defendant was found on a swab of the interior of the condom located at the scene. No sperm was found on the condom.

. JPSO Deputy Kendra Joseph later testified that on June 7, 2013, she brought T.N. from the housing area to the recreation yard. She placed T.N. "on the wall" while she retrieved a key. During that time, there was an altercation between an inmate and another deputy nearby. When Deputy Joseph approached T.N. with the key to let her into the yard, T.N. told her that the "guy” that was having the altercation with the other deputy was the "guy” who had attacked her, and she wanted to speak to someone about that. Deputy Joseph testified that the other deputy had to radio for assistance, during which time he stated that the inmate who was causing the disturbance was Terrence Payne (defendant). Before Deputy Joseph could make arrangements to have someone speak to T.N., she was released from the Correctional Center.

. In his statement, defendant said that T.N. agreed to have sex with him in exchange for money, that they went to an RV in the storage yard, that a white man let them use the RV, that defendant and T.N. had sexual intercourse but defendant did not ejaculate because the man kept banging on the door, and that defendant then gave T.N. ten dollars and left.