STATE OF LOUISIANA

VERSUS

LANCE E. DOUGLAS

NO. 23-KA-331

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 19-2137, DIVISION "G"
HONORABLE E. ADRIAN ADAMS, JUDGE PRESIDING


February 28, 2024


**STEPHEN J. WINDHORST**
**JUDGE**


Panel composed of Judges Susan M. Chehardy,
Stephen J. Windhorst, and Scott U. Schlegel


**CONVICTIONS AND SENTENCES AFFIRMED**
    **SJW**
    **SMC**
    **SUS**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
 Honorable Paul D. Connick, Jr.
 Thomas J. Butler
 Monique D. Nolan
 Zachary L. Grate
 Taylor Somerville

COUNSEL FOR DEFENDANT/APPELLANT,
LANCE E. DOUGLAS
 Prentice L. White

**WINDHORST, J.**

Appellant/defendant, Lance E. Douglas, appeals his convictions for forcible rape in violation of La. R.S. 14:42.1 and sexual battery in violation of La. R.S. 14:43.1. For the reasons that follow, we affirm.

## PROCEDURAL HISTORY

On June 10, 2019, the Jefferson Parish District Attorney's Office filed a bill of information charging defendant, Lance E. Douglas, with second degree rape (known prior to August 1, 2015 as forcible rape) upon a known juvenile (DOB 1/8/1997) on or between January 1, 2010 and May 31, 2011, without her consent and by force or threats of physical violence in violation of La. R.S. 14:42.1 (hereafter referred to as "forcible rape") (count one),[1] and sexual battery upon a known juvenile (DOB 1/8/1997) on or between January 1, 2010 and May 31, 2011, by the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, an/or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim in violation of La. R.S. 14:43.1 (count two).[2] On June 12, 2019, defendant was arraigned and pled not guilty.

On January 3, 2023, trial commenced. On January 5, 2023, a twelve-person jury unanimously found defendant guilty as charged on both counts. Defendant's post-trial motions for acquittal notwithstanding the verdict and new trial were denied by the trial court, and thereafter defendant waived sentencing delays. On January

---

[1] The offense of forcible rape was renamed second degree rape by La. Acts 2015 No. 184, §1 and La. Acts 2015 No. 256, §1, effective August 1, 2015. For purposes of the offense defined by La. R.S. 14:42.1, forcible rape and second degree rape are synonymous. See La. R.S. 14:42.1 C; State v. Breaux, 17-406 (La. App. 3 Cir. 11/02/17), 232 So.3d 675, 676, n.1, writ denied, 17-1967 (La. 10/15/18), 253 So.3d 1309. La. R.S. 14:42.1 C provides:

> C. For all purposes, "forcible rape" and "second degree rape" mean the offense defined by the provisions of this Section and any reference to the crime of forcible rape is the same as a reference to the crime of second degree rape. Any act in violation of the provisions of this Section committed on or after August 1, 2015, shall be referred to as "second degree rape."

Because the commission of the offense in the instant case occurred on or between January 1, 2010 and May 31, 2011, and not after August 1, 2015, count one is referred to as forcible rape in this opinion. See State v. Green, 18-95 (La. App. 5 Cir. 07/31/18), 252 So.3d 566.

[2] On January 3 and January 4, 2023, prior to commencement of trial, the State amended the bill of information to correctly reflect the victim's date of birth as to counts one and two.

12, 2023, the trial court sentenced defendant to forty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count one, and thirty months imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count two, with both sentences ordered to run concurrently. The trial court informed defendant of the sex offender notification requirements pursuant to La. R.S. 15:543, *et seq*.

On January 12, 2023, the State filed an habitual offender bill of information, alleging defendant to be a second-felony offender on both counts pursuant to La. R.S. 15:529.1.[3] Defendant stipulated to being a second-felony offender on both counts. The trial court vacated defendant's original sentences and resentenced defendant to forty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count one, and forty months imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count two. The trial court ordered the sentences to run concurrently and advised defendant of the sex offender notification requirements pursuant to La. R.S. 15:543, *et seq*. Defendant made an oral motion to reconsider sentence, which was denied. Defendant then orally requested an appeal and designation of the record. The same day, defendant followed up with a written motion to reconsider sentence, which was denied, and a motion for appeal and a motion for designation of record, which were granted. This appeal followed.

**EVIDENCE**

Christian Dabdoub, formerly a detective with the Jefferson Parish Sheriff's Office personal violence unit, testified that on March 4, 2019, he responded to a call at 5805 Clover Street in Marrero. Upon arrival, he met with the victim, S.W.,[4] who

---

[3] "La. R.S. 15:529.1 does not prohibit enhancing multiple sentences obtained on the same date arising out of a single criminal act or episode, and therefore all multiple sentences imposed after a single criminal act or episode can be enhanced under the Habitual Offender Law." State v. Payne, 14-715 (La. App. 5 Cir. 05/28/15), 171 So.3d 348, 355, *citing* State v. Shaw, 06-2467 (La. 11/27/07), 969 So.2d 1233, 1245.

[4] In accordance with La. R.S. 46:1844 W(3), this court uses only the victim's initials in this opinion. See also La. U.R.C.A., Rule 5-2.

23-KA-331                                                    2

reported that defendant, her biological father, raped her between January 2010 and May of 2011, and identified him from a single photograph. Mr. Dabdoub applied for an arrest warrant to be issued for defendant after he was unable to locate defendant at his address. Subsequently, defendant was arrested and provided a statement in which he denied S.W.'s allegations. Mr. Dabdoub testified that in May of 2019, S.W. contacted him, which led him to review defendant's inmate phone calls at the Jefferson Parish Correctional Center. Mr. Dabdoub stated that he heard a conversation in which defendant asked an unidentified female to offer S.W. two hundred dollars to go to the district attorney's office and drop all charges against him. Mr. Dabdoub acknowledged that although he had the phone number of the unidentified female, he did not try to contact her.

Anne Troy, Ph.D., an expert in the field of child maltreatment, testified that she is a nurse practitioner and she works part-time at Children's Hospital Audrey Hepburn Care Center, seeing children who have reported sexual abuse. Dr. Troy testified regarding delayed disclosure in sexual abuse cases, and identified the three main reasons for delayed disclosure (*i.e.*, naïveté, shame or guilt, and circumstances in the child's household). She testified that children have what is called "persistence of attachment," and children can continue to be loving and want to have a relationship with the perpetrator while wanting the abuse to stop. Dr. Troy stated that delayed disclosure is common in sexual abuse cases. She also testified that disclosure is a process and that it is common for children or individuals to provide more details as they become more comfortable in disclosing. She testified that if a child is not seen within 24 hours of the sexual abuse, then "all the DNA is gone . . . there's no reason to do a rape kit."

Dr. Troy stated that she never met S.W. and that her testimony was based on her experience and work. Dr. Troy acknowledged that she reviewed one "pysch admit" medical record of S.W. The record showed that S.W. was admitted to a

psychiatric facility when she was sixteen years old, she was suicidal when she was admitted, and she was diagnosed with conduct disorder and single episode major depressive disorder. Dr. Troy testified that the record also showed that S.W. disclosed sexual abuse that occurred when she was thirteen years old.[5]

S.W. testified that her date of birth is January 9, 1997,[6] and on the day of her testimony, she was twenty-five years old. In 2009, when she was twelve years old, she moved from her mother's house in Houston, Texas, to her maternal grandmother's house in Marrero, Louisiana. S.W. testified that around Christmas in 2009, her maternal grandmother asked her to leave and she moved in with her paternal grandmother, defendant's mother Gloria Douglas, who lived two streets away. Defendant, defendant's sister, and his sister's children also lived with Ms. Douglas. S.W. stated that defendant was her biological father, with whom she did not spend a lot of time or know well because he was in and out of her life.[7]

S.W. testified to three incidents of being raped by defendant. She testified that because it was a traumatic event, she specifically remembered that the first time she was "drugged and raped"[8] was on January 10, 2010, two days after her thirteenth birthday. She stated that on that night defendant allowed her to drink alcohol. Defendant gave her three and a half or four "Locos," which she drank because she thought it was acceptable.[9] Before she went to bed, defendant asked her for a hug and a kiss, which she gave him. S.W. testified that it "felt weird" because they did not normally interact in that manner. Defendant was "in and out" of her life and she

---

[5] The "psych admit" record showed that S.W. disclosed that she was sexually abused by her biological father three times when she was thirteen years old.

[6] The bill of information was amended to state that S.W.'s date of birth was January 8, 1997, which is different from the date of birth – January 9, 1997 – given by S.W. in the trial transcript. However, later in her testimony, S.W. stated that after she moved to her paternal grandmother's house, she turned thirteen years old a couple of weeks later on January 8th. She also testified that the first rape occurred on January 10, 2010, two days after her thirteenth birthday. Therefore, it appears that the trial transcript contains a typographical error concerning the date of S.W.'s birth.

[7] At the trial, S.W. identified defendant in open court as her biological father.

[8] S.W. testified that she drank alcohol on the night of the first incident. She did not know if she was "drugged, if any sort of drug was put into [her] drink or anything like that[.]"

[9] S.W. also testified that prior to January 2010, defendant had given her a "sip" of Loco. She testified that defendant thought it was acceptable for a thirteen-year old to drink alcohol. She stated that she did not ask for the alcohol on the date of the first incident, but that he offered her the alcohol.

"barely" had a relationship with him. She testified that when she gave him a hug, he pointed to his cheek for a kiss. When she went to kiss him on the cheek, he "grabbed [her] face" and turned her head so that their lips could meet. At that point, she pushed him off of her and ran to the bedroom she shared with her cousin and locked the door. S.W. stated that when she went to sleep, her cousin was in the room.[10] In the middle of the night, she remembered feeling defendant's chest, "a hard exterior," against her back. S.W. testified that defendant was the only man staying in the house at that time.

S.W. testified that when she woke up the next morning, she was in a "state of shock." She was lightheaded and dizzy, she was in the room by herself, her underwear was pulled to the side, and her pajama pants were on the floor. S.W. testified that she could tell something happened to her vagina because it was sore, swollen, and "very enlarged." She acknowledged that she had sex before the night of January 10th. However, she had not previously had that much alcohol. She testified that she initially did not think she was raped, but rather, thought that her drinking led to the issues she was having "down there."

S.W. testified that when she was approximately thirteen years old, she was raped a second time between September and November. She recalled the month because it ended in "ember." During the second incident, she was at defendant's grandmother's house (her great grandmother, Mildred), which is two streets away from defendant's mother's house. When she went to sleep, defendant, her grandmother, and her great-grandmother were in the house and she was alone in the bedroom. S.W. testified that she woke up in the middle of the night, her arms were restrained behind her back, and she tried to break free.[11] She stated that "there was

---

[10] S.W. acknowledged that she did not initially tell the police her cousin was in the room and they shared a bed. She stated that at the time, she could not recall the events fully. She only remembered when the memories started coming back to her to "deal with it."

[11] S.W. testified, "I remember my arms being tied behind my back. Or I'm sorry, not tied but it was almost like I was in a restraint and I was trying my hardest to break free from the restraint."

some pressing against my shoulder area because it felt as if the arms were going in opposite directions behind my back being pulled." She said that it felt like a weight was on her, it was hard to break from it, and she felt like her airways were trapped because she was on her stomach. S.W. testified that she felt her father vaginally penetrate her with his penis. She kept moving her body, until she was able to break free. When she was struggling to break free, she was on her stomach, her face was buried in the pillow, and her father was making "shushing noises" while he continued to penetrate her. S.W. testified that she knew it was her father penetrating her because she saw his gold teeth in the dark.[12] She stated that his grip "on the restraint" loosened and she was able to pull her clothes up and run to where her grandmother and great grandmother were sleeping on the floor on a palette. She testified that she hid behind defendant's mother and cried herself to sleep. She did not wake either grandmother up or tell them what occurred.[13]

S.W. testified that she was fourteen years old the third time defendant raped her while at her paternal grandmother's house. She was in a bedroom that she considered to be her own room. When she went to bed, it was only her and her grandmother in the house. S.W. testified that when she woke up, she was lying on her stomach and defendant was on top of her on his knees. Defendant's penis was partially inserted inside of her and he was trying to push in deeper "to move in and out but [she] was fighting and trying to resist." S.W. testified that her arms were behind her back, crossed at her wrist. She said that she told defendant to get off of her and she called out to her grandmother until she woke up. Defendant was making a "shushing" noise. Defendant was already dressed and at the door when her grandmother appeared. S.W. testified that her grandmother told defendant to get out of her bedroom and she lectured him about staying out of her bedroom.

---

[12] S.W. testified that her father, defendant, "has a mouth full of gold" and she "saw the gold in the dark."

[13] On cross-examination S.W. testified that she did not look for anything or attempt to try and show the grandmother's anything (i.e., fluids or anything else from the incident) the next morning because as a kid, she was not thinking about anything of that nature. She was "just thinking of fleeing to safety."

S.W. stated that she did not tell her grandmother what happened that night. However, the next day or shortly thereafter, she told her grandmother that defendant had been touching her. Her grandmother responded "Oh baby, don't worry about it. He does the same thing to me. He's just in there looking for a remote." S.W. testified that her grandmother gave her a long tube sock, put a can in it, and told her to hit defendant with it if he came into her room again. S.W. testified that the three incidents of rape were the only ones she remembered.

S.W. further testified that defendant started "molesting" her after the rape incidents. She described molesting as defendant "putting his fingers in [her] vagina" when she was asleep. She testified that defendant would be on the floor next to her bed drunk and reaching up to feel "different parts of [her] vaginal area or [her] butt." She stated that defendant was drunk during the rape and molesting incidents and she knew this because he had an excessively strong smell of alcohol on him each time. S.W. testified that defendant molested her three or four times when she was in the bed. During these incidents, she tried to do something about it each time by calling for her grandmother or fighting him off of her.

S.W. confirmed that defendant's mother never walked in the room and saw any of the incidents. S.W. testified that she did not tell her grandmother about defendant molesting her because of prior physical abuse, and she thought her grandmother would not believe her. She felt that her grandmother did not take her seriously when she reported defendant's rape of her and that her grandmother only provided her with a can in a tube sock. S.W. testified that the sexual abuse by defendant stopped when she moved back to her mother's house in June or July of 2011.

S.W. testified that after the sexual incidents with defendant occurred, she felt really angry, disconnected, and lost. She told her cousin Jasmine and a friend about the incidents. She said she was not able to "get into details" about the incidents with her friend because she would break down and cry; however, she was able to tell her

cousin "some" details. As a result, her cousin would "advocate" for her and she would take her away on weekends. S.W. testified that she did not inform the police about the incidents with defendant because she was scared.

S.W. testified that when she moved back to Texas to live with her mother, she told her mother about the incidents with defendant. She said that her mother advised her that she would have to return to New Orleans to report the incidents. However, when her mother was angry, her mother also told her that she would bring her back to Louisiana so defendant "[could] finish doing that to [her]." She stated that her mother's comment did not make her feel comfortable about coming back to Louisiana to report the incidents. S.W. testified that her mother also used "scare tactics" on her. Specifically, her mother would tell her that if she reported the incidents with defendant, she would repeatedly be asked questions, and her mother asked if she was ready to be questioned. She stated that she did not know how to respond to those statements and questions by her mother. S.W. expressed that she was still dealing with the pain of the incidents and became antisocial and aggressive around people. She testified that for a long time, she did not tell anyone about the incidents with defendant because her mother "threw it back in [her] face," her mother was physically and verbally abusive, her father had abandoned and raped her, and she did not know who she could turn to or who she could trust. S.W. testified that because of the actions of her mother and father, she felt like she was left to fend for herself.

S.W. also testified to the events that led to her being hospitalized on an involuntary commitment one time when she was sixteen years old. She said that the police were at her mother's house because of an altercation between her and her mother. While the police were at the house, she attempted to harm herself. S.W. said her mother was physically abusing her, and she started to stand up to her and attempted to fight back. S.W. testified that she put a knife up to her own neck

because she was tired of the abuse and she was ready for it to end. When asked whether she remembered telling the staff at the hospital that she was sexually abused by her father and physically and verbally abused by her mother, S.W. testified that she remembers the staff asking her those questions, but she could not recall exactly what she told them because she "used to bottle things up." She could not recall if she spoke with the police or family services about the sexual abuse. Upon her release, she stayed with her mother.

S.W. testified that she returned to the New Orleans area when she was seventeen years old and lived with another family member, not either of her grandmothers. She enrolled in school and started working. At that time, she had her father's phone number and she occasionally had contact with him. She testified that she also knew defendant's partner, Quwanda McClure, who was pregnant. She stated that defendant would try to talk to her or invite her over to Ms. McClure's house or her paternal grandmother's house. She visited defendant at Ms. McClure's house three times between 2014 and 2016 and although defendant and Ms. McClure asked her to sleep over, she never did because she was afraid of what defendant might do to her.[14]

On cross-examination, S.W. confirmed that she and defendant got into an argument at one point upon her return to the New Orleans area. Specifically, she acknowledged that defendant was angry with her for telling Ms. McClure about defendant being with another woman. S.W. testified that her stepsister[15] told her that she (the stepsister) has sex with defendant in exchange for money. S.W. explained that defendant had some money at that time, and she wanted to see if defendant would buy her a charger. Later, when she was in the car with defendant and Ms. McClure, she asked defendant to purchase her a charger, and defendant

---

[14] S.W. testified that she was arrested and charged with "something" another person possessed when she was in the New Orleans area. In Texas, she was also convicted of aggravated battery for stabbing a man in the back. She thought he was trying to kidnap her, but realized later that he was trying to help her.

[15] The name of S.W.'s stepsister is not a part of the record.

responded by telling her that she was "grown," and he did not have to do anything for her. S.W. then mentioned that she knew defendant was at her stepsister's house exchanging sex for money. Defendant raised his fist at her as if he was going to hit her and at the same time, Ms. McClure was looking at defendant as if saying "Is this true?" S.W. testified that she then told defendant to drop her off in front of the subdivision. She told defendant that if he hit her, she would have a reason to contact the police and more "probable cause" to send him to jail for what he had done to her. She added that she was under the impression from her mother that she could not make a report about the prior incidents with defendant without a rape kit. She testified that this fight was "the end" for her and her father/defendant. She acknowledged that defendant did not support her financially or emotionally growing up and that he was in and out of her life.

S.W. testified that she called 9-1-1 in March of 2019 and reported the incidents with defendant. Prior to calling, she was walking to catch the bus for work and defendant was riding in a car down her maternal grandmother's street. Defendant was yelling through the sunroof, "Hey big head." She testified that this immediately "triggered" her. She did not realize that she had not dealt with "it" and she felt in fear for her life. She wondered if defendant would do "it" again, so she reported him in order to protect herself. She said she was tired of running from what happened.

S.W. testified that she spoke with the police at her house and gave a statement regarding the incidents with defendant. She also identified defendant from a single photograph as her biological father. She was subsequently approached by defendant's girlfriend, who offered her money to drop the charges against defendant. S.W. testified that she also reported defendant's girlfriend to the detective.

Gloria Douglas, S.W.'s paternal grandmother/defendant's mother, testified that S.W. previously lived with her, and defendant lived with her "off and on." She

stated that S.W. slept in the bedroom next to her bedroom. Ms. Douglas testified S.W. did not tell her that defendant touched her nor did she provide S.W. with a tube sock with a can in it for protection. She said that if S.W. had informed her that defendant had assaulted her, she would have called the police because she would not allow her son to get away with something like that. Ms. Douglas denied that S.W. spent the night with her at her mother's house (S.W.'s great grandmother's house). She confirmed that defendant drinks too much. She testified that this occurs approximately once a week. Ms. Douglas testified that S.W. did not tell her about any good or bad days at school, any bad experiences with a teacher, or any incident with defendant. She stated that S.W. did not talk much.

**ASSIGNMENTS of ERROR**

In his first assignment of error, defendant contends that the trial court committed reversible error when it accepted the jury's guilty verdict even though S.W. did not present any definitive evidence that defendant raped, molested, or abused her when she was thirteen years old. Defendant avers that S.W., who was over the age of majority at the time of the trial, testified that she had a host of mental health issues in her life and she did not report the abuse to either her paternal or maternal grandmothers. Defendant alleges that S.W. acted in retaliation when she reported sexual abuse by him upon learning that he and his girlfriend were expecting a child. Defendant contends that S.W. was not shy about sharing her contempt for him because he was an absent father and she felt abandoned. Defendant claims that this abandonment fueled S.W.'s anger against him and caused her to retaliate with false allegations of sexual abuse. Defendant asserts that without eyewitnesses or DNA evidence, the jury did not have sufficient, credible evidence to support its verdicts against defendant.

An appellate court, in reviewing the sufficiency of evidence, must determine if the evidence, whether direct, circumstantial, or a mixture of both, viewed in the

light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Chinchilla, 20-60 (La. App. 5 Cir. 12/23/20), 307 So.3d 1189, 1195, writ denied, 21-274 (La. 04/27/21), 314 So.3d 838, cert. denied, — U.S. —, 142 S.Ct. 296, 211 L.Ed.2d 138 (2021); State v. Sosa, 05-213 (La. 01/19/06), 921 So.2d 94, 99. Under the Jackson standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt, but rather, whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. State v. Flores, 10-651 (La. App. 5 Cir. 05/24/11), 66 So.3d 1118, 1122.

Review for sufficiency of evidence requires the reviewing court to defer to the trier of fact's rational credibility calls, evidence weighing, and inference drawing. State v. Clifton, 17-538 (La. App. 5 Cir. 05/23/18), 248 So.3d 691, 702. This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. State v. Caffrey, 08-717 (La. App. 5 Cir. 05/12/09), 15 So.3d 198, 202, writ denied, 09-1305 (La. 02/05/10), 27 So.3d 297; State v. McKinney, 20-19 (La. App. 5 Cir. 11/04/20), 304 So.3d 1097, 1102. Further, a reviewing court errs by substituting its appreciation of the evidence and the credibility of witnesses for that of the fact-finder and overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Lane, 20-181 (La. App. 5 Cir. 01/27/21), 310 So.3d 794, 804.

Defendant was convicted of forcible rape upon a known juvenile in violation of La. R.S. 14:42.1 (count one) and sexual battery upon a known juvenile in violation of La. R.S. 14:43.1 (count two). On appeal, defendant does not assert that the State

failed to prove any specified statutory element of the crimes for which he was convicted. Instead, defendant specifically challenges his convictions on the basis of S.W.'s credibility and lack of physical, medical, or scientific evidence to corroborate S.W.'s testimony.

Because defendant does not raise any arguments relating to the sufficiency of the evidence with respect to the statutory elements, it is not necessary to discuss the evidence as it relates to each essential element. See State v. Patton, 22-112 (La. App. 5 Cir. 12/21/22), 355 So.3d 156, 169 n.5, writ denied, 23-151 (La. 11/08/23), 373 So.3d 60; State v. Nelson, 14-252 (La. App. 5 Cir. 03/11/15), 169 So.3d 493, 500 n.12, writ denied, 15-685 (La. 02/26/16), 187 So.3d 468.

The credibility of a witness, including the victim, is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. State v. Gonzalez, 15-26 (La. App. 5 Cir. 08/25/15), 173 So.3d 1227, 1233. The testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. Gonzalez, 173 So.3d at 1232; Lane, 310 So.3d at 804; State v. Bruce, 14-877 (La. App. 5 Cir. 03/25/15), 169 So.3d 671, 675, writ denied, 15-833 (La. 03/04/16), 187 So.3d 1007. It is presumed that the trier of fact considered discrepancies in testimony in assessing credibility and weight of testimony. State v. Bridgewater, 22-517 (La. App. 5 Cir. 04/26/23), 362 So.3d 998, 1007; Gonzalez, 173 So.3d at 1232. Therefore, the reviewing court must defer to the trier of fact's rational credibility calls, evidence weighing, and inference drawing. Clifton, 24 So.3d at 702. In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. Lane, 310 So.3d at 804.

We find that S.W.'s testimony, without the introduction of medical, scientific, or physical evidence, was sufficient to satisfy the elements for both charged sex offenses. S.W. provided detailed testimony regarding three incidents in which defendant forced her to have vaginal sexual intercourse with him without her lawful consent, although defendant was only charged with one count of forcible rape. S.W. also testified that defendant touched her vagina and/or buttocks without her consent when she was thirteen or fourteen years old on three or four occasions, even though defendant was only charged with one count of sexual battery of a minor. Therefore, based on the record, the jury found S.W. to be a credible witness and believed her testimony that one or more the incidents with defendant occurred. We find that a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found beyond a reasonable doubt that the evidence was sufficient under the Jackson standard to support defendant's convictions.

In his second assignment of error, defendant contends that the trial court committed reversible error in allowing other crimes evidence to be admitted during trial. Defendant argues that the State did not file a "403 motion" to inform the defense that it intended to use other crimes evidence. Defendant avers that the jury heard evidence that family members (with or without defendant's knowledge) attempted to bribe S.W. to drop all felony charges against him. Additionally, the jury heard testimony from S.W. that she learned of defendant's sexual mistreatment of another female relative. Defendant contends that neither of these outside allegations were proven and therefore, amounted to baseless rumors. He avers that without any credible evidence to support the allegations, it is more likely than not that the jury was prejudiced against defendant and credited S.W.'s allegations of being raped because of the alleged other crimes. Defendant contends that the trial court abused its discretion by permitting S.W. to give testimony relative to these

prejudicial, and inflammatory statements and the jury should have been instructed to disregard these statements.

In order to preserve the right to seek appellate review of an alleged trial court error, the party claiming the error must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for that objection. La. C.Cr.P. art. 841. State v. Lane, 20-137 (La. App. 5 Cir. 12/23/20), 309 So.3d 886, 907, writ denied, 21-100 (La. 04/27/21), 314 So.3d 836. A defendant is limited on appeal to matters to which an objection was made, but also to the grounds for his objection articulated at trial. Id. The requirement of a contemporaneous objection is to put the court on notice of an alleged irregularity so that opposing counsel may respond on the issue, and the trial judge may cure a legitimate problem and prevent the defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. State v. Anthony, 17-372 (La. App. 5 Cir. 12/30/20), 309 So.3d 912, 927, writ denied, 21-176 (La. 10/12/21), 325 So.3d 1067, cert. denied, 598 U.S. —, 143 S.Ct. 29, 214 L.Ed.2d 214 (2022); State v. Patin, 13-618 (La. App. 5 Cir. 09/24/14), 150 So.3d 435, 441-441, writ denied, 14-2227 (La. 04/22/16), 191 So.3d 1043; State v. Devillier, 17-572 (La. App. 5 Cir. 10/17/18), 258 So.3d 230, 261, writ denied, 18-1855 (La. 10/08/19), 280 So.3d 589.

The record shows that on November 8, 2019 and May 25, 2022, the State filed a pleading titled, "State's Answer to Motions for Discovery, State's Motion for Discovery, Demand for Notice of Alibi and/or Mental Condition Defenses, and State's Notice of Intent to Introduce Evidence of Other Offenses." In both pleadings, under Subsection VII, the State's answer specified, "The State gives written notice of its intent to introduce evidence admissible under Louisiana Code of Evidence Articles 404 and 412.2 as described in the discovery which has been, or will be,

provided by the State."[16]  The record also reflects that defendant did not object to the State's answer, request a 404B hearing, or file a motion in limine to prohibit the introduction of other crimes evidence.

During its opening statement at trial, the State referred to the allegation that S.W. was offered money to drop the charges against defendant.  In pertinent part, the prosecutor said:

> You will also hear that the victim reproached [*sic*] him about a month later after the defendant had been arrested saying that she had been contacted by members of the defendant's family offering her money to drop the charges.  The detective then investigated that and went back and listened to jail calls made by the defendant and did, in fact, find the call where he discussed family members offering her money to drop the charges.

Defense counsel did not make a contemporaneous objection to the prosecutor's opening statement pursuant to La. C.Cr.P. art. 841, and did not make a motion for a mistrial and/or did not request an instruction for the jury to disregard those statements pursuant to La. C.Cr.P. art. 770.[17]

Additionally, defense counsel did not contemporaneously object on several occasions to testimony regarding S.W. being offered money to drop the charges.  When Mr. Dabdoub was asked about S.W. contacting him the second time in May 2019, defense counsel responded, "Objection to hearsay."  The State responded that Mr. Dabdoub's testimony was *res gestae*, and Mr. Dabdoub would not testify regarding the content of his conversation with S.W.  The trial court overruled the objection, and Mr. Dabdoub then testified only that he met with S.W. on a second occasion.  As a result of what Dabdoub was told during his second meeting with S.W., he reviewed defendant's inmate phone calls.  In one phone conversation, defendant asked an unidentified female to have someone offer S.W. two hundred

---

[16] The substance and details of what was provided in the State's discovery is not a part of the record.

[17] Pursuant to La. C.Cr.P. art. 770, when the district attorney refers directly or indirectly to "another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible," the defense is required to make a motion for a mistrial.  "If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial."

dollars in exchange for dropping the charges. Defense counsel did not contemporaneously object to Mr. Dabdoub's testimony of defendant's statements contained within defendant's inmate phone call. Furthermore, during cross-examination, defense counsel asked Mr. Dabdoub additional questions regarding defendant's inmate phone call and offering S.W. money to drop the charges.

During S.W.'s testimony, the State asked her if she was approached by someone, and if she contacted the detective afterwards. Defense counsel responded, "Objection, hearsay," and the court sustained the objection. S.W. was then asked if she was approached by someone related to defendant, and S.W. responded that defendant's girlfriend offered her money to drop the charges. Defense counsel did not make a contemporaneous objection to this testimony.

Therefore, we find that because defendant (1) did not request a hearing or file a motion to prohibit the introduction of other crimes evidence (*i.e.*, the attempt to bribe S.W. to drop the charges against defendant) in response to the State's answer; (2) did not move for a mistrial upon the admission of other crimes evidence or request an admonition pursuant to La. C.Cr.P. art. 770; and (3) did not object to the testimony regarding other crimes evidence both prior to and during trial pursuant to La. C.Cr.P. art. 841, all resulted in a waiver of his right to assert this error on appeal. See State v. Berroa-Reyes, 12-581 (La. App. 5 Cir. 01/30/13), 109 So.3d 487, 499; State v. Sterling, 95-673 (La. App. 5 Cir. 02/27/96), 670 So.2d 1316, 1324; State v. Smith, 19-97 (La. App. 4 Cir. 07/17/19), 363 So.3d 412, 420, writ denied, 19-1555 (La. 11/12/19), 282 So.3d 227; State v. Guidroz, 498 So.2d 108, 110 (La. App. 5 Cir. 1986); Official Revision Comment (b) to La. C.Cr.P. art. 770.[18]

---

[18] Nevertheless, we find the evidence of defendant's attempt to bribe or dissuade S.W. from testifying was relevant to show defendant's consciousness of guilt, and therefore, was admissible. See State v. Graves, 301 So.2d 864, 866 (La. 1974); State v. Williams, 497 So.2d 1376, 1379 (La. 1986); State v. Wilson, 14-878 (La. App. 5 Cir. 05/28/15), 171 So.3d 356, 365, writ denied, 15-1204 (La. 05/27/16), 192 So.3d 741, *citing* State v. Johnson, 426 So.2d 95 (La. 1983); State v. Curington, 09-867 (La. App. 5 Cir. 10/26/10), 51 So.3d 764, 772, writ denied, 10-2612 (La. 04/08/11), 61 So.3d 684.

Defendant also argues that S.W.'s testimony regarding defendant having sex with S.W.'s stepsister in exchange for money amounted to evidence of other crimes, *i.e.*, defendant sexually mistreated another female relative, defendant promoted prostitution, and that defendant harbored a lustful disposition for having sex with another female relative.

During cross-examination, defense counsel, not the State, elicited testimony regarding whether S.W. had an argument with defendant. S.W. testified that her stepsister told her that she (S.W.'s stepsister) has sex with defendant in exchange for money. S.W. testified that later, she was in the car with defendant and Ms. McClure and asked defendant to purchase a charger for her. When defendant declined her request, she told defendant and Ms. McClure that she knew defendant was having sex with her stepsister in exchange for money. S.W. stated that defendant responded by raising his fist at her as if he wanted to hit her, and Ms. McClure looked at him as if saying, "Is this true?" S.W. said she told defendant that if he hits her, she would have more probable cause to send him to jail. Defense counsel did not object to S.W.'s testimony, and in fact, he asked additional questions to clarify the argument between S.W. and defendant.

In State v. Hernandez, 98-448 (La. App. 5 Cir. 05/19/99), 735 So.2d 888, 900, writ denied, 99-1688 (La. 11/12/99), 750 So.2d 194, the defendant argued inadmissible other crimes evidence was admitted at trial. The defendant asserted that a witness testified that the defendant was involved in purchasing marijuana, and another witness expressed concern that the defendant was going to murder family members. This court highlighted that the record reflected that the testimony was originally elicited by defense counsel, and held, "Because defendant opened the door through interrogation, the defense cannot now complain on appeal." Id.

Here, defense counsel elicited the other crimes evidence through S.W.'s testimony, and defense counsel further questioned S.W. regarding defendant having

sex with S.W.'s stepsister. Because defense counsel opened the door by asking S.W. about her argument with defendant, and asked follow-up questions regarding defendant having sex with S.W.'s stepsister, we find that defendant cannot now complain on appeal. See Hernandez, 735 So.2d at 900. Moreover, pursuant to La. C.Cr.P. art. 841, defense counsel made no contemporaneous objections during S.W.'s testimony regarding defendant having sex with S.W.'s stepsister in exchange for money. Consequently, we find defendant waived his right to assert this error on appeal.

**ERRORS PATENT**

The record was reviewed for errors patent, according to the mandates of La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); and State v. Weiland, 556 So.2d 175 (La. App. 5 Cir. 1990). There are no errors patent that require corrective action.

**DECREE**

Accordingly, for the reasons stated herein, defendant's convictions and sentences are affirmed.

**CONVICTIONS AND SENTENCES AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**FEBRUARY 28, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 23-KA-331

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE E. ADRIAN ADAMS (DISTRICT JUDGE)
MONIQUE D. NOLAN (APPELLEE)          THOMAS J. BUTLER (APPELLEE)

**MAILED**
PRENTICE L. WHITE (APPELLANT)          HONORABLE PAUL D. CONNICK, JR.
ATTORNEY AT LAW                        (APPELLEE)
LOUISIANA APPELLATE PROJECT            DISTRICT ATTORNEY
16731 CICERO AVENUE                    TAYLOR SOMERVILLE (APPELLEE)
BATON ROUGE, LA 70816                  ZACHARY L. GRATE (APPELLEE)
                                       ASSISTANT DISTRICT ATTORNEYS
                                       TWENTY-FOURTH JUDICIAL DISTRICT
                                       200 DERBIGNY STREET
                                       GRETNA, LA 70053